No. 04-411

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 23

ALLEN OLEN HOWARD,

      Plaintiff and Appellant,

   v.

ST. JAMES COMMUNITY HOSPITAL; SISTERS OF
CHARITY OF LEAVENWORTH; RICHARD C.
THORNE, M.D.; PRUDENCE D. WHITWORTH, R.N.;
CARMINE McGIVERN, R.N.; ELENA ICENOGGLE,
R.N.; and NANCY STONE, R.N.,

      Defendants, Respondents and Cross-Appellants.

APPEAL FROM:    The District Court of the Second Judicial District,
                   In and For the County of Silver Bow, Cause No. DV 2000-189,
                   Honorable Kurt D. Krueger, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

             Kevin E. Vainio, Attorney at Law, Butte, Montana

       For Respondents:

             Lee Bruner, Poore, Roth & Robinson, Butte, Montana (Hospital)

             J. Daniel Hoven and Sara B. Stanton, Browning, Kaleczyc,
             Berry & Hoven, Helena, Montana (Thorne)

                         Submitted on Briefs:  November 22, 2005

                                 Decided:  January 31, 2006

Filed:

_____
                         Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Plaintiff and Appellant, Allen Olen Howard, filed a medical negligence lawsuit in the Second Judicial District Court against Defendants, St. James Community Hospital, Sisters of Charity of Leavenworth, Richard C. Thorne, M.D., Prudence D. Whitworth, R.N., Carmine McGivern, R.N., Elena Icenoggle, R.N. and Nancy Stone, R.N. All parties moved for summary judgment, and their motions were denied. The case went to trial, resulting in a unanimous jury verdict in favor of the defendants. Howard appeals the District Court's denial of his summary judgment and directed verdict motions, as well as the jury's verdict. St. James Community Hospital cross-appeals on behalf of itself and the four registered nurses. We affirm the District Court rulings, as well as the jury verdict. Because we affirm, we decline to address St. James's cross-appeal.

¶2 We restate the issues as follows:

¶3 1. Did the District Court err in denying Howard's motions for partial summary judgment and for a directed verdict regarding liability for alleged violations of the AIDS Prevention Act?

¶4 2. Did the District Court abuse its discretion in instructing the jury regarding (A) negligence and statutory damages, (B) *res ipsa loquitur*, and (C) the exception to the AIDS Prevention Act's informed consent provision?

¶5 3. Did the District Court abuse its discretion by excluding evidence of Howard's compression fractures to the spine?

2

## BACKGROUND

¶6      On August 18, 1997, Howard, in the presence of his roommate, Rita Schultz, suffered a seizure in his home in Butte, Montana. At the time, Howard's then girlfriend and now wife, Pam Hunter, with whom he (along with his two sons) also lived, was at Montana Development Center where she worked as a Residential Nurse Supervisor. Schultz called Hunter to inform her of the seizure and then took Howard to St. James Hospital.

¶7      According to Dr. Thorne, Howard's emergency room physician, Howard initially appeared confused but behaved cooperatively. While Dr. Thorne recorded Howard's medical history, he met Schultz, whom, according to Dr. Thorne, introduced herself as Howard's roommate and girlfriend. (Dr. Thorne testified that this later confused him when Hunter *also* introduced herself as Howard's "girlfriend.") Because Howard did not exhibit typical signs of epilepsy, Dr. Thorne considered other possible causes of Howard's seizure, including trauma, infection, low oxygen, neurological conditions, drug and/or alcohol use, and AIDS encephalopathy. Dr. Thorne ordered tests to determine the cause of the seizure, including a CT scan of Howard's head, blood testing (a CBC and a 508 panel) and a chest X-ray. Prior to the administration of the tests, Hunter arrived, at which time Schultz departed the hospital.

¶8      After the CT scan, while still in the radiology suite, Howard suffered another grand mal seizure. Informed of the seizure, Dr. Thorne reported to radiology and observed Howard in a postical state, exhibiting confusion. According to Dr. Thorne and the treating nurses, Howard's behavior altered significantly, turning combative and violent—involving punching and kicking—to the point of raising significant safety issues for both Howard and those

3

around him. The treatment Howard received from Dr. Thorne and the medical staff in the emergency room from this point forward is the basis of Howard's complaint.

¶9 Dr. Thorne testified that because Howard's behavior turned dangerously violent, he ordered a dose of Valium. When Howard's combative impulses continued, Dr. Thorne ordered restraints, which Howard resisted. Howard calmed for a period of time, at which point Hunter (a nurse), who was present, discussed with Howard seeking treatment elsewhere. During this discussion, Hunter assisted Howard in removing the restraints. When the nursing staff realized the restraints had been removed, several personnel, against Howard's will, put him back in the hard leather straps. In light of Howard's two grand mal seizures and the heavy medication administered to him, Dr. Thorne believed Howard was not competent to make any medical decisions, and ordered that Howard should not leave the hospital.

¶10 Throughout Howard's ordeal, Hunter spoke with staff and Dr. Thorne about Howard's condition. She explained to Dr. Thorne that she was Howard's girlfriend and a nurse; she also provided Dr. Thorne information about Howard's medical history. Dr. Thorne discussed with Hunter performing a lumbar puncture on Howard to look for signs of infection or subarachnoid hemorrhage; Hunter agreed that Dr. Thorne should do the procedure. To ensure stillness during the procedure, Dr. Thorne administered more Valium to Howard.

¶11 Dr. Thorne also ordered an HIV test, as HIV is an infection that can turn into AIDS encephalopathy, a condition that can cause seizures. Neither Dr. Thorne, nor hospital personnel, requested Howard or Hunter's consent for the HIV test. At trial, Dr. Thorne

4

testified that since he had "snowed" Howard with a great deal of medication, Howard lacked capacity to consent to the test. Howard also did not receive post-test counseling. The test results were subsequently sent to Howard by mail; they were negative.

¶12 Dr. Thorne arranged for Howard's transfer to the intensive care unit where he received care from a neurologist. After his release from the hospital, Howard, experiencing physical pain, spent a couple weeks off work recuperating. He saw a chiropractor who diagnosed him with back sprain and strain.

¶13 Howard subsequently brought this action against St. James to recover for alleged personal injuries suffered while in the emergency room.

## STANDARD OF REVIEW

¶14 Our review of a district court's grant or denial of a motion for summary judgment is *de novo*. Therefore, we apply the same Rule 56, M.R.Civ.P., criteria as applied by the district court. Pursuant to Rule 56, M.R.Civ.P., the movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does not exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. We review the legal determinations made by a district court as to whether the court erred. *Associated Press v. Crofts*, 2004 MT 120, ¶ 11, 321 Mont. 193, ¶ 11, 89 P.3d 971, ¶ 11.

¶15 This Court reviews an order denying a motion for a directed verdict in a light most favorable to the non-moving part. The courts will exercise the greatest self-restraint in

5

interfering with the constitutionally mandated processes of jury decision. Unless there is a complete absence of any credible evidence in support of the verdict, a motion for judgment notwithstanding the verdict is not properly granted. *Wise v. Ford Motor Co.* (1997), 284 Mont. 336, 343, 943 P.2d 1310, 1314.

¶16 The standard of review for a district court's refusal to issue a proposed jury instruction is whether the court abused its discretion. In reviewing for abuse of discretion, this Court does not determine whether it agrees with the trial court. Rather, we consider whether the trial court, in its exercise of discretion, acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reasons in view of all circumstances. *Byers v. Cummings*, 2004 MT 69, ¶ 17, 320 Mont. 339, ¶ 17, 87 P.3d 465, ¶ 17.

¶17 When reviewing a district court's evidentiary ruling, our standard of review is whether the court abused its discretion. The district court has broad discretion in determining the admissibility of evidence. We will not reverse the district court unless the error be "of such character to have affected the result." *Payne v. Knutson*, 2004 MT 271, ¶ 20, 323 Mont. 165, ¶ 20, 99 P.3d 200, ¶ 20 (citation omitted).

## DISCUSSION

**1. Did the District Court err in denying Howard's motions for partial summary judgment and for a directed verdict regarding St. James's liability for alleged violations of the AIDS Prevention Act?**

6

¶18    Howard argues that, as a matter of law, St. James violated the AIDS Prevention Act, § 50-16-1007, MCA, by performing an HIV test when he was unconscious or incompetent, without seeking informed consent from Hunter, whom he argues was his "significant other."

¶19    The AIDS Prevention Act reads in relevant part:

**50-16-1007.  Testing – counseling – informed consent – penalty.** (1) An HIV-related test may be ordered only by a health care provider and only after receiving the informed consent of:
(a)  the subject of the test;
(b)  the subject's legal guardian;
(c)  the subject's next of kin or *significant other* if:
(i)   the subject is unconscious or otherwise mentally incapacitated
(ii)  there is no legal guardian;
(iii) there are medical indications of an HIV-related condition; and
(iv) the test is advisable in order to determine the proper course of treatment of the subject; or
(d)  the subject's next of kin or *significant other* or the person, if any, designated by the subject in hospital records to act on the subject's behalf if:
(i)  the subject is in a hospital; and
(ii) the circumstances in subsections (1)(c)(i) through (1)(c)(iv) exist.

. . . .

(9) *Subsections (1) through (6) do not apply to*:
. . .
(c) the performance of an HIV-related test when:
(i)  the subject of the test is unconscious or otherwise mentally incapacitated;
(ii)  there are medical indications of an HIV-related condition;
(iii) the test is advisable in order to determine the proper course of treatment of the subject; and
(iv) *none of the individuals listed in subsection (1)(b), (1)(c), or (1)(d) exists or is available within a reasonable time after the test is determined to be advisable* . . . .

Section 50-16-1007, MCA (emphasis added).

7

¶20 Statutory law defines "significant other" as "an individual living in a current spousal relationship with another individual but who is not legally a spouse of that individual." Section 50-16-1003(18), MCA. Because Hunter was Howard's live-in girlfriend in 1997, he argues that Hunter qualified as his "significant other." Consequently, Howard contends that since he was "mentally incapacitated"—due to suffering two grand mal seizures and being administered large doses of sedative medication—St. James should have sought consent from Hunter, his significant other, before ordering an HIV test.

¶21 St. James does not dispute that Howard was unable to provide consent to the HIV testing due to mental incapacity. However, St. James asserts that a genuine issue of material fact existed as to whether Hunter qualified as a "significant other" given that her relationship with Howard was unclear in the minds of Dr. Thorne and the other medical staff. At trial, Dr. Thorne testified that there was much confusion over the nature of Howard's relationships with Schultz and Hunter given that Schultz brought Howard to the emergency room and identified herself as his "girlfriend" and "roommate," and then Hunter arrived, claiming to live with Howard as his "girlfriend."

> It was a very confusing situation. I had a woman that came in with Mr. Howard [Schultz], who said that she was his roommate and girlfriend. And now I've got somebody else that says she's his girlfriend [Hunter]. I didn't feel like I could get a consent from either one of them at this point. It was confusing.
>
> . . . .
>
> It was a very abnormal event. I mean, normally you don't have somebody coming in saying they're their roommate, and then you've got somebody else. That was an unusual event . . . .

8

When asked why he identified Hunter as a "friend" in his case notes, Dr. Thorne testified: "I [was] not trying to cause harm to Mr. Howard. I [didn't] want to put down things in the chart that [could have been] used, you know, against him that [had] no medical basis."

¶22 Howard dismisses St. James's defense, arguing that "it is irrelevant whether [St. James] had actual knowledge of [Hunter]'s status" because the AIDS Prevention Act "requires only that there be a 'significant other' who 'exists' and that he or she be 'available within a reasonable time after the test is deemed advisable.'" We disagree. If St. James lacked the requisite information that Hunter qualified as Howard's significant other, it cannot be held responsible for failing to seek her consent to the HIV test. Here, Hunter's explanation of her relationship to Howard proved unclear in light of the fact that earlier in the day Schultz presented herself as having the same relationship to Howard as Hunter claimed. Consequently, whether or not St. James understood Hunter to be Howard's statutorily defined "significant other" provided a genuine issue of material fact for the jury to decide. Additionally, there was enough credible evidence to support a finding that Hunter did not legally qualify as such.

¶23 The District Court properly denied Howard's motions for partial summary judgment and a directed verdict.

**2. Did the District Court abuse its discretion in instructing the jury regarding (A) negligence and statutory damages, (B) *res ipsa loquitur*, and (C) the exception to the AIDS Prevention Act's informed consent provision?**

9

¶24 (A) The District Court provided the jury several instructions on negligence and damage awards. Howard argues that these instructions were insufficient because they did not allow the jury to determine whether St. James acted "recklessly" and they failed to inform the jury that the AIDS Prevention Act requires a defendant to pay *per se* damages if it finds the defendant violated the Act by acting negligently or recklessly.

¶25 Section 50-16-1013, MCA, allows a person aggrieved by a violation of the AIDS Prevention Act to recover "against a person who negligently violates a provision of this part, damages of $5,000 or actual damages, whichever is greater" and "against a person who intentionally or recklessly violates a provision of this part, damages of $20,000 or actual damages, whichever is greater." Section 50-16-1013(1)(a) and (1)(b), MCA. Howard maintains that the jury should have been instructed on the above language so that the jury could not only decide whether St. James acted "recklessly," but also understand "that the law presumes a monetary injury" from a violation of the Act; Howard insists that "[i]f the jury could see no [actual] damages they might presume there was no injury and, hence, no liability."

¶26 A district court does not need to instruct on a theory unless there is evidence to support the theory. *Edie v. Gray*, 2005 MT 224, ¶ 21, 328 Mont. 354, ¶ 21, 121 P.3d 516, ¶ 21. Howard fails to cite any evidence in the record which would support a jury instruction on his claim that St. James acted "recklessly." Moreover, the court provided the jury with a special verdict form that asked whether St. James "breach[ed] the standard of care in the medical treatment provided to Allen Howard." The jury answered in the negative. Although

10

the court did not specifically instruct on recklessness, the jury's finding of no breach of the standard of care eliminated any possibility of recklessness. We conclude that the court did not abuse its discretion in only instructing on negligence.

¶27 Additionally, Howard argues that the jury was uninformed that a finding of negligence would require an award of damages to Howard because the court did not instruct the jury on *statutory* damages. Given the jury's finding that St. James did not breach the standard of care, the issue of damages was moot. *Christofferson v. City of Great Falls*, 2003 MT 189, ¶ 51, 316 Mont. 469, ¶ 51, 74 P.3d 1021, ¶ 51.

¶28 (B) Howard also insists that the court should have instructed the jury on *res ipsa loquitur*, the doctrine that permits proof by circumstantial evidence.

> The doctrine of *res ipsa loquitur* permits an inference of negligence on the part of one in control of an instrumentality which causes injury when (1) the injury occurs without any fault of the injured person; (2) the instrumentality is under the exclusive control of the defendant at the time of the injury; and (3) the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care.

*Romans v. Lusin*, 2000 MT 84, ¶ 32, 299 Mont. 182, ¶ 32, 997 P.2d 114, ¶ 32.

¶29 Howard maintains that *res ipsa loquitur* applies because the hospital restraints (the so-called "instrumentality") were "under the exclusive control" of St. James. While it is possible that Howard's back injury resulted from the use of restraints, evidence also supports a finding that the seizures alone could have caused the injury. If the restraints were not necessarily the cause of Howard's injury, *res ipsa loquitur* does not apply. Accordingly, the court properly refused to instruct the jury on this doctrine.

11

¶30    (C) Finally, Howard argues that "there was no emergency" requiring HIV testing, therefore the court erred by instructing the jury that "[t]here is an exception to the informed consent doctrine *for emergencies*." (Emphasis added.)  When analyzing instructions, we look at them as a whole.  *Edie*, ¶ 21.  An earlier instruction stated the AIDS Prevention Act's guidelines regarding when an HIV test may be ordered without informed consent:

> (i) the subject of the test is unconscious or otherwise mentally incapacitated;
> (ii) there are medical indications of an HIV-related condition;
> (iii) the test is advisable in order to determine the proper course of treatment of the subject; and
> (iv) none of the individuals listed [including a "significant other"] in subsection (1)(b), (1)(c), or (1)(d) exists or is available within a reasonable time after the test is determined to be advisable . . . .

Section 50-16-1007(9)(c), MCA (emphasis added).  Reviewing the instructions together, we hold that the District Court properly instructed the jury.

¶31    Additionally, we disagree with Howard's assertion that the court misled the jury by instructing: "The fact that [Howard] and Pam Hunter are presently married does not establish Pam Hunter Howard was a 'significant other' as prescribed by Montana Law in August of 1997."  Howard contends that "the fact that [he and Hunter] are currently married is evidence of their close relationship in August of 1997."  For purposes of informed consent, the Act required Howard and Hunter to have been living in a spousal relationship in 1997.  The fact that Howard and Hunter married a few years after the incident at St. James Community Hospital does not conclusively bear on their status in 1997.  The jury was appropriately instructed.

12

¶32     Finally, Howard also contends that "even conceding all the other requirements for [the] exception," subsection (9)(c)(iv) was not met because Hunter qualified as Howard's "significant other" and, since she was "available," St. James should have sought her consent. As we have already noted, however, it was the jury's duty to determine whether or not Hunter qualified as a "significant other." We determine there was substantial credible evidence to support the jury's verdict. *See Onstad v. Payless Shoesource*, 2000 MT 230, ¶ 56, 301 Mont. 259, ¶ 56, 9 P.3d 38, ¶ 56.

**3.      Did the District Court abuse its discretion by excluding evidence of Howard's compression fractures to the spine?**

¶33     Prior to trial, St. James filed a motion *in limine* requesting exclusion of a report by Dr. V. Patrick Hughes interpreting X-rays of Howard's spine as showing "some slight compression." St. James argued to the District Court that Dr. Hughes's expert report should be disallowed because Howard disclosed the report eight months after the expert disclosure deadline, thereby precluding St. James from properly researching and preparing a rebuttal. The court granted the defense motion.

¶34     In light of this ruling, Howard argues that the court erred when it allowed St. James to elicit trial testimony from Howard concerning previous compression fractures he sustained in 2000 and/or 2001 to show that seizures alone can cause compression fractures. Howard's argument misses the point. The court did not grant the motion *in limine* due to a lack of relevancy—the court disallowed Dr. Hughes's report because Howard failed to meet the expert witness disclosure deadline.

13

¶35 A district court has broad discretion in determining the admissibility of evidence, *Payne*, ¶ 20. Howard has failed to demonstrate the prejudice created by this ruling—particularly since the jury did not reach the issue of damages. We conclude that the court did not abuse its discretion; therefore, we affirm its ruling.

¶36 We affirm on all three issues.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JIM RICE
/S/ BRIAN MORRIS