No. 05-028

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 90

SOMONT OIL COMPANY, INC.,
a Montana Corporation,

        Plaintiff and Appellant,

   v.

A & G DRILLING, INC., CAVALIER PETROLEUM,
INC., A.G. WALLS a/k/a JOE WALLS, JOHN WALLS,
and STEWART HOWELL, a/k/a CAVALIER-WALLS
JOINT VENTURE,

        Defendants, Respondents and Cross-Appellants.

APPEAL FROM:    The District Court of the Ninth Judicial District,
                In and For the County Toole, Cause No. DV 98-020,
                Honorable Marc G. Buyske, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Gregory J. Hatley and James A. Donahue, Davis, Hatley, Haffeman
                and Tighe, P.C., Great Falls, Montana

        For Respondents:

                Douglas C. Allen, Corder and Allen, Great Falls, Montana

                Richard Beatty, Attorney at Law, Shelby, Montana

                        Submitted on Briefs:  January 18, 2006

                                  Decided:  May 2, 2006

Filed:

_____
                        Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 This case began in 1998 when Somont Oil Company, Inc. (Somont) sought to quiet its leasehold and/or mineral interest in twenty-eight oil and gas leases located in the Kevin/Sunburst field, occupied by defendants (C-W), in Toole County, Montana. Somont argued that its leases were valid and enforceable to the exclusion of any leasehold interest by C-W because, under the agreement terms, C-W's interest terminated due to cessation of production. The District Court entered judgment pursuant to a jury trial, and Somont appealed to this Court. We reversed and remanded for a new trial. Subsequent to the second trial, the jury returned a verdict favorable to Somont as to three of the leases and favorable to C-W as to five of the leases, and the court entered judgment accordingly. Somont now appeals, and C-W cross-appeals.

¶2 We state the issues presented by Somont on direct appeal as follows:

1. Did the District Court err in concluding that C-W met its burden of proving that cessation of production was temporary and denying Somont's motion for judgment as a matter of law?

2. Did the District Court err in not awarding Somont its costs and attorney fees pursuant to § 82-1-201, MCA?

¶3 We state C-W's issues on cross-appeal as follows:

1. Did the District Court err in concluding as a matter of law that the leases at issue had failed to produce in paying quantities?

2. Did the District Court err in limiting the time frame for which evidence could be presented regarding the restoration of production to the leases?

2

¶4     We reverse in part, affirm in part and remand for further proceedings.

## BACKGROUND

¶5     In 1991 C-W purchased a number of oil and gas leases in the Kevin-Sunburst oil field in Toole County, Montana.  (For a complete discussion of this case's history, *see Somont Oil Co. v. A & G Drilling, Inc.*, 2002 MT 141, ¶¶ 5-12, 310 Mont. 221, ¶¶ 5-12, 49 P.3d 598, ¶¶ 5-12 (*Somont I*).)  C-W held these leasehold properties pursuant to the contingencies of various habendum clauses, which permitted C-W a viable leasehold interest as long as C-W produced oil and gas in paying quantities from said leaseholds.  Asserting that C-W's leases had terminated due to lack of production, Somont informed C-W on April 10, 1998, that Somont had acquired the leases from the Kevin-Sunburst lessors.  Accordingly, Somont demanded that C-W execute lease releases on the twenty-eight properties; C-W refused.  Somont consequently filed suit in the Ninth Judicial District Court on May 20, 1998.  C-W eventually executed releases on twenty of its Kevin-Sunburst leases, but refused to tender releases on the other eight.  The parties therefore proceeded to trial on whether C-W's eight remaining leases had terminated due to a cessation of production.

¶6     After the close of evidence, the court denied Somont's motion for a judgment as a matter of law and instructed the jury to consider "all surrounding circumstances"—oil prices, economic considerations and C-W's financial condition—in determining whether C-W's leases had terminated for a lack of production.  Having considered such evidence, the jury returned a verdict in favor of C-W, finding that none of the eight leases terminated due to a lack of production.  Somont renewed its motion for judgment as a matter of law, and in the alternative, moved for a new trial.  The District Court denied both requests.  In its final judgment, the court ordered both parties to pay attorney fees.

3

¶7 Somont appealed the judgment and the court's order denying its motion for a judgment as a matter of law, arguing that the District Court erred in allowing the jury to consider oil prices, economic considerations and C-W's financial condition in determining whether the leases terminated due to a lack of production. We agreed with Somont on this issue. We further concluded that Somont established that the leases failed to produce in paying quantities and remanded for retrial on the question of whether cessation was permanent or temporary.

¶8 This Court noted in *Somont I*, that Montana is an "ownership-in-place state with regard to oil, gas and other minerals, . . . [which] means oil and gas leases transfer to the lessee a fee simple determinable estate with the lessor retaining a possibility of reverter." *Somont I*, ¶ 26. Automatic termination takes place when paying quantities cease to occur. *Somont I*, ¶ 26. We reiterated that "paying quantities" is defined as the "amount of production which would pay a small profit over the cost of operation of the well, excluding from consideration the initial cost of bringing the well into production." *Somont I*, ¶ 27. In order to mitigate the harshness of automatic termination, we adopted the *temporary cessation of production doctrine*. "Pursuant to this doctrine, once a plaintiff establishes that an oil and gas lease has halted production, the burden shifts to the defendant to prove that the cessation was temporary and not permanent. A temporary cessation in production will not trigger an automatic termination of the lease as contemplated in the habendum clause." *Somont I*, ¶ 28.

¶9 In determining a judicial test for the temporary cessation doctrine, we looked to Texas—also an ownership-in-place jurisdiction—for guidance, and held that "actions commenced to terminate oil and gas leases invoke two distinct inquiries: (1) Is the lease producing in paying quantities?; and (2) If not, was the cessation in production permanent or temporary?" *Somont I*, ¶ 33. With regard to the first

4

inquiry, we concluded that "Somont established at trial that the leases failed to produce in paying quantities during the accounting period prescribed by the District Court." *Somont I*, ¶ 30. As to the second question, we determined that "cessation in production will only be deemed temporary when it is caused by a *sudden stoppage of the well* or a *mechanical breakdown of the equipment* used in connection with the well, or the like." *Somont I*, ¶ 33 (emphasis added). Consequently, we held that the District Court abused its discretion by allowing the jury to consider oil prices, economic considerations, and C-W's financial condition in determining whether C-W's cessation was justified as temporary. *Somont I*, ¶ 36. We ordered a new trial, noting that C-W deserved "an opportunity to present its evidence in accordance with the temporary cessation of production factors adopted herein." *Somont I*, ¶ 38. We also noted that the District Court would have to reconsider the attorney fee issue on remand.

¶10 During the second trial in June 2004, the court granted Somont's motion to preclude C-W from offering evidence not previously produced at the Rule 30(b)(6), M.R.Civ.P., deposition of the corporate designees. Consequently, the court limited C-W's evidence to its Exhibit 538 and the explanations provided by C-W designees, John Walls (Walls) and Karie Frydenlund. Although Joe Walls (Joe) also testified, the court specifically precluded C-W from offering any testimony from Joe that contradicted its Rule 30(b)(6) designees. The trial resulted in a 459-page transcript of fact-intensive testimony regarding the eight leases at issue and their wells: Leach Lease (one well); A. Lorenzen Lease (twenty-three wells); Hurley Lease (three wells); Haugen-Fee Lease (six wells); Bluhm Lease (twenty-three wells); Allen 3 & 17 Lease (twenty-seven wells); Rice-Bluhm Lease (seventeen wells); and Caine

5

Lease (thirty-seven wells).[1]   While Exhibit 538 and the accompanying testimony from Walls and Frydenlund explained the reason some wells stopped operating and whether repairs were undertaken, the jury was provided no information regarding the majority of down wells.

¶11   C-W designees acknowledged throughout trial that even though C-W had the capabilities to repair down wells, it often did not undertake such repairs.  Walls further testified that C-W chose to let frozen gun barrels thaw in the spring, rather than warm them in the winter.  Cumulatively, the evidence before the jury showed that the majority of wells on each lease were down during the period in question, January 1, 1996, through April 10, 1998.

¶12   Following the close of evidence at trial, Somont moved the court to enter judgment as a matter of law, arguing that C-W failed to meet its burden of proving that the production temporarily ceased:

> Your honor, we would like to make a Motion for a Directed Verdict, pursuant to Rule 50 of the Montana Rules of Civil Procedure.  I think it has been quite clear that the burden of proof in this matter, as the Court has already ruled, has been upon the Defendants to prove that the cessation of production, as established by the Court, was not temporary in nature, as the Court has indicated in its rulings.  In order to establish whether or not it was temporary it's necessary that you show:  why the lease shut down, whether it was due to a sudden stoppage of the well, mechanical breakdown, or the like.  On a vast majority of each and everyone [sic] of the leases, Your Honor, there's no information, whatsoever, as to why any of those wells shut down or why they were shut down.  And on that basis, with regards to each lease, Your Honor, there's just no evidence for this jury to determine that the lease shut down, not any particular one well, but that the lease shut down due to a sudden stoppage of the well, mechanical breakdown, or the like.

¶13   The court denied Somont's motion, stating that "there's sufficient evidence to prohibit . . . granting [the] motion, and to allow this matter to go to the jury."  The jury returned a verdict favorable to C-W on five of the leases (A. Lorenzen Lease, Bluhm Lease, Allen Lease, Rice-Bluhm Lease, and Caine Lease) and favorable to Somont on the remaining three.  Somont renewed its motion for a

---

[1]See Appendix 1 for a chart summary of Exhibit 538.

judgment as a matter of law with regard to the five leases on which it did not prevail; it also requested attorney fees and costs pursuant to § 82-1-202(1), MCA. The court denied both motions.

DISCUSSION

¶14 **1. Did the District Court err in concluding that C-W met its burden of proving that cessation of production was temporary and denying Somont's motion for judgment as a matter of law?**

¶15 This Court's standard of review of appeals from district court orders granting or denying motions for judgment as a matter of law is identical to that of the district court. Judgment as a matter of law is properly granted only when there is a complete absence of any evidence which would justify submitting an issue to a jury. All such evidence and any legitimate inferences that might be drawn from that evidence must be considered in the light most favorable to the party opposing the motion. *Williams v. Union Fidelity Ins. Co.*, 2005 MT 273, ¶ 19, 329 Mont. 158, ¶ 19, 123 P.3d 213, ¶ 19. We review a district court's decision regarding a motion for judgment as a matter of law to determine whether the district court abused its discretion. *Glacier Tennis Club v. Treweek Const. Co.*, 2004 MT 70, ¶ 46, 320 Mont. 351, ¶ 46, 87 P.3d 431, ¶ 46.

¶16 At the close of evidence, Somont moved the court to enter judgment as a matter of law, arguing that C-W failed to meet its burden of proving that the cessation of production was temporary. We agree with Somont and therefore hold that the District Court should have entered judgment as a matter of law.

¶17 "A cessation in production will only be deemed temporary when it is caused by a sudden stoppage of the well or a mechanical breakdown of the equipment used in connection with the well, or

8

the like." *Somont I*, ¶ 33. "The diligent lessee who takes immediate steps to rectify a sudden halt in production will not lose his or her investment," *Somont I*, ¶ 32, during such a temporary stoppage.

¶18    C-W bore the burden of proving that the cessation of production on all eight leases at issue was temporary. *See Somont I*, ¶ 28 ("once a plaintiff establishes that an oil and gas lease has halted production, the burden shifts to the defendant to prove that the cessation was temporary and not permanent"). In other words, C-W had to prove at trial that all cessations in production were caused by sudden involuntary stoppages or mechanical breakdown of the wells on the leases, and that C-W engaged in diligent efforts to immediately restore production.

¶19    Somont argues that "C-W failed, totally and completely, to meet its burden. . . . C-W's evidence was limited to information contained in its Exhibit 538, which showed neither the reason(s) that wells were down nor any effort(s) to restore production from those wells." According to Somont, "C-W failed to even begin establishing a *prima facie* case . . . ."

¶20    In response, C-W argues that it presented substantial evidence during trial, both testimonial and documentary, demonstrating that all down wells were caused by involuntary sudden stoppage, mechanical breakdown, or the like. In support of this assertion, C-W cites Joe's testimony that the devastating November 1996 ice storm "affected all of the leases." C-W also quotes Joe as stating that C-W "never" shut the wells down. Walls, C-W's designee, however, testified that the November 1996 ice storm had no affect on the majority of wells (and therefore leases) and that he did not know why the majority of wells were not operating. Given that the District Court specifically precluded any testimony from Joe that contradicted Walls, C-W's reliance on Joe's testimony is misplaced.

9

¶21    By utilizing C-W's evidence and witnesses, Somont established at trial that each lease had one or more periods of consecutive months of no production from January 1, 1996, to April 10, 1998.

> Leach Lease: The 1 well down August 1996 through April 1998; no information why it stopped operating or of repair efforts.
>
> A. Lorenzen Lease:  All 23 wells down, except for 2 that operated for ten days in May 1997; except for 1 well, no information why the wells failed to operate or of repair efforts.
>
> Hurley Lease:  Of the 3 wells, 2 operated periodically; no information why the wells failed to operate or of repair efforts.
>
> Haugen-Fee Lease:  All 6 wells down, except 1 well that operated for five days in 1997; no information why the majority of wells failed to operate or of repair efforts.
>
> Bluhm-Lease:  All 23 wells down, except 1 well that operated for a few months; no information why the majority of wells failed to operated or of repair efforts.
>
> Allen Lease (Allen 3 & Allen 17):  Of the 27 wells, 3 operated intermittently and for only days at a time; no information why the majority of wells failed to operate or of repair efforts.
>
> Rice-Bluhm Lease:  Of the 17 wells, only 4 operated intermittently for brief periods; no information why the majority of wells failed to operate or of repair efforts.
>
> Caine Lease:  Of the 37 wells, 13 operated sporadically and for very brief periods; no information why the majority of wells failed to operate or of repair efforts.

¶22    In light of the fact that the evidence failed to account for why the majority of wells on the eight leases failed to operate and/or whether repair efforts were undertaken, C-W failed in its burden to establish that production ceased because of a sudden stoppage of the well or a mechanical breakdown of the equipment used in connection with the well, or the like.  Moreover, C-W failed to show that it diligently took immediate steps to rectify the halt in production since it provided no information whether it undertook repair efforts on the majority of wells.

¶23 Given the complete lack of evidence as to why the majority of wells failed to operate and whether repairs were undertaken, there was no basis for submitting the question of whether cessation was temporary to the jury. Considering all of the evidence and the legitimate inferences in a light most favorable to C-W, we conclude that the District Court abused its discretion when it denied Somont's motion for a judgment as a matter of law.

¶24 **2. Did the District Court err in not awarding Somont its costs and attorney fees pursuant to § 82-1-201(1), MCA?**

¶25 Our standard of review of a trial court's order granting or denying attorney fees and costs is whether the court abused its discretion. *Gullet v. Van Dyke Const. Co.*, 2005 MT 105, ¶ 12, 327 Mont. 30, ¶ 12, 111 P.3d 220, ¶ 12.

¶26 Somont moved the District Court to include in its final judgment an award of costs and attorney fees pursuant to § 82-1-202(1), MCA, which provides:

> If the lessee or assignee thereof neglects or *refuses to execute a release* as provided by this part, the owner of the leased premises may sue in any court of competent jurisdiction to obtain the release, and in such action he also may recover from the lessee, his successor, or assigns the sum of $100 as damages, all costs, together with a *reasonable attorney's fee for preparing and prosecuting the suit*, and any additional damages that the evidence in the case warrants. [Emphasis added.]

¶27 Following the second trial, the District Court denied both parties any attorney fees or costs, rationalizing that no "prevailing party" existed, as "both Somont and C-W gained and both Somont and C-W lost in this litigation in relation to the original complaint." We disagree.

¶28 Somont originally filed suit to compel C-W to execute releases on twenty-eight leases at issue. Although C-W initially refused, it eventually executed releases on twenty of the leases, leaving eight

11

for the jury to address in the first trial.[2]  Thus, prior to the initial trial, Somont had prevailed on twenty of the twenty-eight leases at issue.  At the second trial, Somont prevailed on three more leases.  Even before our decision to reverse on the five other leases, Somont was the prevailing party on twenty-three leases when the District Court issued its order and therefore, we hold that it abused its discretion in not granting Somont reasonable attorney fees.

¶29    Reversed and remanded for determination of reasonable attorney fees.

## **CROSS-APPEAL**

¶30    **1.  Did the District Court err in concluding as a matter of law that the leases at issue had failed to produce in paying quantities?**

¶31    Our review of a district court's grant or denial of a motion for summary judgment is *de novo*.  Therefore, we apply the same Rule 56, M.R.Civ.P., criteria as applied by the district court.  Pursuant to Rule 56, M.R.Civ.P., the movant must demonstrate that no genuine issues of material fact exist.  Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist.  Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law.  We review the legal determinations made by a district court as to whether the court erred.  *Howard v. St. James Community Hospital*, 2006 MT 23, ¶ 14, 331 Mont. 60, ¶ 14, 129 P.3d 126, ¶ 14 (citation omitted).

---

[2]The District Court stated in its October 26, 2004, judgment that the parties initially disputed twenty-five leases, resolving seventeen before the first trial.  Because *Somont I* and the parties' briefs state that Somont commenced litigation on twenty-eight leases and C-W released twenty prior to the first trial, we have chosen to apply these latter figures.  In any event, the result would be the same.

¶32    Prior to trial, Somont sought summary judgment on the theory that C-W had forfeited and terminated all eight leases based upon evidence produced at the first trial and this Court's opinion in *Somont I*. The District Court granted the motion in part, concluding that "[s]ummary judgment that the leases in question failed to produce in paying quantities is appropriate as is an order limiting the scope of the evidentiary inquiry at the second trial in this matter."

¶33    As previously noted, we established in *Somont I* that "actions commenced to terminate oil and gas leases invoke two distinct inquiries:  (1) Is the lease producing in paying quantities?; and (2) If not, was the cessation in production permanent or temporary?"  *Somont I*, ¶ 33.  C-W argues that the District Court incorrectly interpreted our holding in *Somont I* when it limited retrial to the second inquiry.  According to C-W, this Court specifically did *not* limit the new trial issues to consideration of the second prong of the *Somont I* test.  Therefore, C-W contends, the District Court should have denied summary judgment altogether and allowed the jury to address both prongs of the test.  We disagree with C-W's assertion that this Court did not answer the first inquiry of the two-part test established in *Somont I.*

¶34    In *Somont I*, we concluded that the District Court abused its discretion in allowing the jury to consider oil prices, economic considerations, and C-W's financial condition in determining whether oil and gas leases had terminated due to a lack of production.  *Somont I*, ¶ 23.  In reaching this conclusion, we "adopt[ed] the temporary cessation of production doctrine as it applies to the oil and gas arena," *Somont I*, ¶ 28, thereby expanding upon our earlier decision in *Christianson v. A.A. Oil Corp. and Byrne* (1973), 161 Mont. 420, 506 P.2d 1369.  *Somont I*, ¶¶ 30 and 35 ("[t]he equitable notions contemplated [in *Christianson*] remain valid considerations but apply only to the 'producing in paying

13

quantities' prong of the two-part test"). In adopting the second inquiry and thus instituting a two-part test, we specifically concluded that Somont answered the first inquiry when we stated that "*Somont established at trial that the leases failed to produce in paying quantities . . . .*" *Somont I*, ¶ 30 (emphasis added).

¶35    In addition to concluding that Somont satisfied the first inquiry in the initial trial, we noted in our summary to the second issue that "C-W has not yet had an opportunity to present its evidence in accordance with the temporary cessation of production factors adopted herein." *Somont I*, ¶ 36. Given that we had previously adopted the first inquiry of the two-part test in *Christianson*, the factors adopted in *Somont I* related to the second inquiry and the way in which we deemed that question should be answered—that is, whether cessation of production was caused by sudden involuntary stoppages or mechanical breakdown of the wells on the leases, and whether C-W engaged in diligent efforts to immediately restore production.

¶36    In light of the above holdings, we conclude that the District Court did not abuse its discretion when it granted partial summary judgment, limiting retrial to the second inquiry articulated in *Somont I* (whether the cessation in production was temporary or permanent).

¶37    **2.    Did the District Court err in limiting the time frame for which evidence could be presented regarding the restoration of production to the leases?**

¶38    When reviewing a district court's evidentiary ruling, our standard of review is whether the court abused its discretion. The district court has broad discretion in determining the admissibility of evidence. We will not reverse the district court unless the error is of such character to have affected the

14

result. *Payne v. Knutson*, 2004 MT 271, ¶ 20, 323 Mont. 165, ¶ 20, 99 P.3d 200, ¶ 20 (citations omitted).

¶39 At retrial, the District Court chose January 1, 1996, to April 10, 1998, as the examination period for determining whether the non-producing leases resumed production. The court selected April 10, 1998. as the final date because it was the day Somont wrote C-W a letter stating that five of the eight leases had terminated. C-W argues that the court abused its discretion in selecting this period of examination because C-W should have been allowed to submit evidence that some of the leases resumed production after April 10, 1998.[3]

¶40 In light of our conclusion on Issue I of Somont's appeal—that C-W failed to meet its burden of proving that the majority of leases failed to operate due to a sudden stoppage of the wells or a mechanical breakdown of the equipment—we do not need to reach the question of whether the District Court erred in limiting the time frame for which evidence could be presented regarding the restoration of production to the leases.

¶41 Affirmed.

/S/ W. WILLIAM LEAPHART

---

[3]Notably, while the District Court chose April 10, 1998, as the end date, the court still permitted C-W to introduce evidence of any efforts it made to restore production after that date, so long as C-W showed that the effort resulted from a course of action taken prior to April 10, 1998. C-W offered no such evidence at trial.

We concur:


/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JIM RICE
/S/ BRIAN MORRIS

| Leach 1 well | A. Lorenzen 23 wells | Hurley 3 wells | Haugen-Fee 6 wells | Bluhm 23 wells | Allen 3 & 17 27 wells | Rice-Bluhm 17 wells | Caine 37 wells |
|---|---|---|---|---|---|---|---|
| Up 1/31-2/7/96, 5/9-5/31/96, 6/1-6/30/96, 7/1-7/27/96.<br><br>Down 8/96—4/98. | All wells Down, except:<br>#1 & 24A Up 10 days 5/97.<br><br>*Repairs 5/97:*<br>*#24 Clean well, tubing leak, swabbed, pulled rods & tubing run.* | Well #42 Up 1/96-8/96.<br><br>All wells Down 9/96-1/97.<br><br>#42 Up 2/24-8/6/97;<br>#52 Up 5/20-5/30/97.<br><br>All wells down 8/97-4/98. | All wells Down 1/96-4/97.<br><br>#1 Up 5/28-6/3/97, leaking Gun Barrel.<br><br>All wells down 7/97-4/98.<br><br>*Repairs5/2/97 & 6/4/97:*<br>*Pull rods, 6' insert, change out 15 rods, pumped oil of top of leaking GB, pumped bottom of GB after water drained, unloaded vac truck into stock tank.* | All wells Down 1/96-6/97.<br><br>#1 Up 7/9-9/15/97.<br><br>All wells down 10/97-4/98, except #1 Up 2 days in 11/97 & 4 days in 4/98. | *Allen 3*:<br>All wells down 1/96—4/98.<br><br>*Allen 17*:<br>All wells Down 1996, except those listed below.<br>All wells Down 1/97-3/97 & 8/97-12/97.<br>All wells Down 1/98-4/98<br># 6 Up 1/25/96, then Frozen, Up 4/18-10/17/96, 10/23-10/31/96, 11/1-11/13/96, Electrical problem.<br>*Froze* 1/26/96, *Replaced belt* 9/96, *Replaced king nipple* 10/96.<br>*Repairs 4/29/97* *Rod Job, replace 27 rods*<br><br>#9 Up 1/1-1/5, 1/11-1/16/96, 4/18-5/14/96, 5/17-11/13/96 & 12/96. Electrical problem.<br>*Froze 1/16/96, Replaced belt 9/5/96.*<br>*Replaced gate valve 4/24/97*<br><br>#10 Up 8/14-11/13/96. Electrical problem.<br>*4/30-7/22/97 Rod Job, replace 27 rods, greased #6, 9 & 10, Nipple for GB, #9 flow line leak by GB, #6 & 10 need gear* | All wells Down 1996, except those listed below.<br><br>#8, Up 1/1/96, 5/7-10/15/96.<br><br>#10 Up 1/31 & 2/1/96<br><br>#11 Up 1/1-3/3/96, 3/29-6/18/96, 6/21-7/5/96, 7/19-11/13.<br>Down 12/96 for electrical.<br><br>*Repairs 1996: Broken burn stack, #11 down fuse trons 6/10, broke unit 7/6*<br>*#8 replaced belt 9/3.*<br><br>All wells Down 1997-April 1998, except #8, 9, 10, 11 in 5/97, then Down for flow line leak.<br><br>*1997:*<br>*Series of repair efforts on #8, 9, 10, 11 and 24.* | All wells Down except:<br>#4, 5, 6, 7, 9, 28, 30, 31, 36, 40, 42, 45, 49, Up sporadically and mostly for *very* brief periods.<br><br>*Repairs 1996:*<br>*Replaced belt #4, 5, 19, 28, 42, 45*<br>*#19 Changed belt*<br>*#49 gate valve riser*<br><br>*Repairs 1997:*<br>*#7 & 28 gear oil*<br>*#28 belt change*<br>*#4 greased*<br>*#36 plunger insert*<br>*#5 90 degree elbow & line rope*<br>*#4 belt*<br>*#6 powered off*<br>*#49 Rod job*<br>*#33 Rod job*<br>*#45 parted rods, pull tubing, sandpump, bail replace tubing, cleaned well, pulled rods & tubing.*<br>*#28 Rodg job*<br>*#5 purchased v-belt*<br><br>*Repairs 1998:*<br>*#45 V-Belt*<br>*#31 belt*<br>*#7 v-belt* |

17

| | | | | | *oil, gas line* | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |