No. 05-103

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 188

JAMES TALCOTT CONSTRUCTION, INC.,

   Plaintiff and Appellant,

 v.

P&D LAND ENTERPRISES, a joint venture
consisting of NDI, INC., a Montana corporation,
STERLING INVESTMENTS, INC., a Montana
Corporation, and BVL/WHITEFISH, a California
Corporation, et al.,

   Defendants and Respondents.

APPEAL FROM: The District Court of the Eleventh Judicial District,
      In and For the County of Flathead, Cause No. DV 92-453A,
      Honorable Ted O. Lympus, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

      Jack L. Lewis, Jardine, Stephenson, Blewett & Weaver,
      Great Falls, Montana

   For Respondents:

      Daniel W. Hileman, Kaufman, Vidal & Hileman,
      Kalispell, Montana

         Submitted on Briefs: January 11, 2005

            Decided: August 15, 2006

Filed:

     _____
           Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Plaintiff James Talcott Construction (Talcott) and Defendant P&D Land Enterprises (P&D) entered into a contract under which Talcott would construct condominiums on Whitefish Lake in Whitefish, Montana.  Problems, delays and disputes arose leading Talcott to sue P&D in the Eleventh Judicial District Court seeking to foreclose on a construction lien and for certain costs.  P&D counterclaimed for breach of contract.  The District Court appointed a special master to hear the case.  The District Court subsequently adopted, with some modifications, the Special Master's findings of fact and conclusions of law.  Talcott appeals.  We affirm in part and reverse and remand in part.

¶2     This Court issued its original Opinion in this case on June 27, 2006.  Talcott filed a Petition for Rehearing on July 10, 2006.  P&D filed its Objection to the Petition for Rehearing on July 18, 2006.  In its Petition, Talcott correctly argued that this Court erroneously concluded that it was not entitled to post-judgment interest on certain discreetly identifiable amounts sought by Talcott but denied by the District Court. On August 1, 2006, we issued an Order withdrawing our June 27, 2006, Opinion.  We replace it with this superseding Opinion.

**ISSUES**

¶3     A restatement of the issues presented on appeal is:

¶4     Did the District Court err in concluding that Talcott was contractually obligated to perform punch list and warranty work, and in awarding the cost of that work to P&D?

¶5     Did the District Court err in refusing to approve prejudgment interest on the amount Talcott is entitled to recover under its construction lien?

¶6     Did the District Court err in refusing to award Talcott overhead costs which it claimed resulted from P&D-responsible delays?

¶7     Did the District Court err in its award of fees to Talcott?

## FACTUAL AND PROCEDURAL BACKGROUND

¶8     P&D Enterprises is a joint venture consisting of two Montana corporations and a California corporation, all of which also are individual defendants in this case. P&D, as owner of real property located in Whitefish, Montana, entered into a $1.3 million contract with Talcott in 1991, under which Talcott was to construct fifteen condominium units designated as Whitefish Condominiums-Phase II. Talcott furnished a performance bond for $1.3 million and agreed to a one-year warranty period following substantial completion of the project, which contractually was scheduled for February 1, 1992. Under the terms of the contract, Talcott was to be paid a "bonus" of $17,500.00 for on-time completion of the project. However, if completion was not achieved by February 1, Talcott would be penalized $30.00 per day per unit until a Certificate of Occupancy was issued.

¶9     The contract also contained the following relevant provisions:

A.    Talcott would submit its monthly "application for payment" to P&D's Architect by the fifth of each month for work and supplies furnished the previous month;

B.    P&D's Architect would approve Talcott's bill and certify the amount to be paid;

C.    P&D agreed to pay the certified amount by the 25th day of the same month;

3

D.      if P&D failed to pay, Talcott could provide seven written days notice after which it could stop work until payment was received;

E.      interest was to be paid by P&D from the date payments were due to Talcott; and

F.      costs caused by delays were to be borne by the party responsible for the delays.

¶10     Fourteen of the fifteen units were not completed by February 1, 1992; these units had Certificates of Occupancy issued on April 24, May 1, 6, 8 and 14. It is undisputed that the "completion" dates for these 14 units had been extended from February 1 to various dates between April 6 and May 1. On June 1, Talcott submitted its application for payment in the amount of $106,748.55 for work and materials furnished through May, 1992. Of this amount, P&D's Architect certified $83,141.50 for payment. However, from the certified amount, P&D then withheld the following sums: 1) $38,640.00 as penalty for Talcott's failure to complete the units by February 1; 2) $15,000.00 as the claimed cost of repainting the Phase II units (P&D alleged that Talcott had painted the Phase II units a different color from the Phase I condo units.); 3) $10,000.00 representing P&D's estimated cost for one year of warranty work, on the ground that it suspected Talcott would not return to perform this work and it would be required to hire someone else to do it; and 4) approximately $7,251.00, representing the difference in the cost of floor and tile work and materials actually used versus the cost of this work and materials as included in the original contract. The total amount withheld from Talcott's certified June bill was $70,891.00.

¶11     As a result of P&D's refusal to pay Talcott's certified bill, Talcott notified P&D by written notice on June 26 that it would stop work on July 3, 1992. As a consequence of Talcott leaving the job, P&D proceeded to perform the various unfinished tasks required to

finish construction of the units, *i.e.*, the "punch list" of undone tasks, as well as other work which P&D considered covered by the one year warranty. This work cost P&D $12,807.33.

¶12 On July 15, 1992, Talcott filed a construction lien on the property for $143,912.81. In August, P&D made a partial payment to Talcott of approximately $51,692.00, which Talcott applied first to interest owing, then to the unpaid principal balance. In September 1992, P&D made another partial payment of approximately $11,515.00 that Talcott similarly applied. In October 1992, Talcott filed an action in the District Court to foreclose the lien and recover the costs of extended overhead. The construction lien has since attached to the real property. After Talcott filed its complaint, P&D filed a counterclaim asserting that Talcott breached the original contract by failing to complete the warranty work and the "punch list." Finally, after the complaint was filed, P&D paid Talcott the additional sum of $9,356.67. In August 1994, the District Court appointed a special master to hear the case.

¶13 Talcott argued that P&D owed it substantial sums in principal and interest based on P&D's refusal to pay Talcott's bill. Talcott asserted that it should not have been penalized for failing to complete the units by February 1, 1992, as required by the contract, because the delays were caused by P&D. Talcott maintained that P&D made numerous additions, deletions and revisions to the work in progress which resulted in time delays and added costs for which Talcott should be paid. Moreover, Talcott claimed that P&D had extended completion dates for several units but then wrongfully reverted to the original completion date of February 1 when it calculated penalties.

5

¶14    The contractor also claimed that the difference in the disputed exterior paint color was caused by P&D requesting that Phase II be painted with a more protective oil-based paint while Phase I had been painted with latex paint. Additionally, Talcott attributed some of the difference to weather-related fading of the exterior paint on the Phase I units. Talcott disclaimed any responsibility or liability associated with the difference in paint color, and maintained that it should be paid the $15,000.00 withheld by P&D.

¶15    Talcott further complained that P&D wrongfully withheld $10,000 for warranty work despite the $1.3 million performance bond Talcott had posted. Additionally, the contract established that payment could be withheld only *by the Architect* for certain specified reasons, and, as Talcott noted, the Architect had made no determination that Talcott's work was defective. Talcott asserted that P&D's decision to withhold these funds "in anticipation of possible problems" was arbitrary and unjustified.

¶16    Talcott claimed that in addition to the contract price for the work performed, it incurred $7,250.64 in costs for materials and work done at P&D's request but for which no written change orders were signed. Lastly, Talcott sought an additional $13,205.00 for excavation cost overruns, claiming the difficult soil caused the excavation phase to take longer than anticipated and made it more expensive. It also sought additional overhead costs allegedly occasioned by P&D delays.

¶17    The Special Master considered these claims as well as P&D's counterclaim that Talcott had breached the contract by providing defective work or materials. The master concluded that there was no evidence of defective work and that Talcott's failure to complete

6

the units by February 1 was the fault of P&D; therefore, the penalty provision of the contract was unenforceable. The Special Master held that Talcott was entitled to payment of the withheld penalty amount of $38,640.00. It also held, however, that Talcott was *not* entitled to payment for its claimed higher overhead costs due to these delays. The Special Master noted that the contract price included costs of overhead and profit.

¶18    The Special Master also concluded that Talcott was entitled to the $15,000.00 withheld by P&D based on the alleged application of the wrong exterior paint. The master concluded that Talcott had applied the exterior paint called for in the bid specifications, and therefore was not liable for any perceived color difference.

¶19    The Special Master further concluded, inexplicably, that Talcott was entitled to $31,469.23[1] for additional work and materials provided but for which no written change orders had been executed, and that it should recover $1,268.33 for additional flooring work.

¶20    The Special Master further determined that P&D was entitled to keep the $10,000.00 it had withheld in anticipation that Talcott would not perform the warranty/punch work after it had left the job. Moreover, the Special Master instructed Talcott to pay P&D the additional sum of $2,807.33 to cover P&D's costs for having some of this work performed by other contractors. The Special Master, concluding that "it was not clear prior to the trial that any of the sums were owing to either party," also determined that under the circumstances of this case, prejudgment interest was not appropriate. The master denied Talcott's request for additional excavation costs noting that Talcott learned of the soil situation prior to executing

7

the contract and failed to adjust its contract price accordingly. Lastly, the Special Master recommended that the District Court treat this matter not as a foreclosure, but as a breach of contract for which money damages would suffice.

¶21 On July 15, 1999, the District Court adopted the majority of the Special Master's Findings of Fact, Conclusions of Law and Recommendation. In briefs submitted to the District Court after the Special Master had reached a decision, Talcott conceded that the Special Master had miscalculated the amount to which Talcott was entitled for additional work. Talcott indicated that the total amount it had requested and was due for additional work was $7,250.64. The District Court therefore adjusted the Special Master's award of $31,469.23 for additional work downward to $7,250.64. The court thereafter determined that P&D owed Talcott $60,890.64[2] but that Talcott owed P&D $2,807.33 for additional warranty work. It concluded, however, that it had no authority to convert Talcott's claim under the construction lien to a breach of contract action.

¶22 The District Court entered Judgment to the effect that P&D owed Talcott $58,083.31 ($60,890.64 minus $2,807.33), plus costs and reasonable attorney fees to be determined in a supplementary proceeding. The court also awarded Talcott 10% interest on the amount owed from the date of the Judgment.

¶23 Talcott immediately filed a Memorandum of Costs and Disbursements seeking $68,789.80 in costs and attorney fees. P&D challenged Talcott's claim of costs and fees as

---

[1] The amount sought was $7,250.64, *not* $31,469.23.
[2] $38,640.00 + $15,000.00 + $7,250.64 = $60,890.64

unreasonable and untimely. In November 1999, P&D, in partial satisfaction of the Judgment, paid Talcott $60,040.64.

¶24 The case then languished in the court for almost two years. Ultimately, a hearing on costs and fees was held in October 2001. In May 2003, the District Court issued its Findings of Fact, Conclusions of Law and Order on Talcott's Memorandum of Costs and Attorney Fees. The court concluded that the hours reported and the attorney fees claimed were not supported by credible evidence and did not appear to be reasonable. The court therefore limited Talcott's attorney fees to 1.5 times the number of hours claimed by P&D's counsel, and requested P&D's counsel to submit an affidavit of its fees. The court awarded Talcott its costs as well. In November 2004, the District Court awarded Talcott $27,654.00 in attorney fees and $2,272.25 in costs and disbursements.

¶25 Talcott filed a timely appeal.

## STANDARD OF REVIEW

¶26 This case involves a review of findings of fact and conclusions of law. For conclusions of law, the standard of review is whether the district court correctly interpreted the applicable law. This Court applies a clearly erroneous standard using a three-part test to review a district court's findings of fact. First, we review the record to determine if the findings are supported by substantial evidence; second, if the findings are supported by substantial evidence, we will determine if the trial court has misapprehended the effect of the evidence; and third, if substantial evidence exists and the effect of the evidence has not been misapprehended, the Court may still conclude that a finding is clearly erroneous when a

9

review of the record leaves the Court with the definite and firm conviction that a mistake has been made. *Fiedler v. Fiedler* (1994), 266 Mont. 133, 137-38, 879 P.2d 675, 678 (citations omitted).

¶27 Our standard of review of a trial court's order granting or denying attorney fees and costs is whether the court abused its discretion. *Somont Oil Co. v. A & G Drilling*, *Inc.*, 2006 MT 90, ¶ 25, 332 Mont. 56, ¶ 25, 137 P.3d 536, ¶ 25 (citation omitted).

¶28 A district court's award of prejudgment interest is a question of law; therefore, this Court determines whether the district court correctly applied the law. *American Music Co. v. Higbee*, 2004 MT 349, ¶ 13, 324 Mont. 348, ¶ 13, 103 P.3d 518, ¶ 13 (citation omitted).

## DISCUSSION

¶29 *Did the District Court err in concluding that Talcott was contractually obligated to perform punch list and warranty work, and in awarding the cost of that work to P&D?*

¶30 The relevant provisions of the contract between Talcott and P&D provided:

Article 9.5.1 The Architect may decide not to certify payment and may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the [required] representations to the Owner . . . cannot be made. . . . The Architect may also decide not to certify payment . . . because of: 1) defective Work not remedied; . . . 6) reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; . . . .

Article 9.7.1 If the Architect does not issue a Certificate for Payment, through no fault of the Contractor, within seven days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount certified by the Architect or awarded by arbitration, then the Contractor may, upon seven additional days' written notice to the Owner and Architect, stop the Work until payment of the amount owing has been received.

¶31  As noted above, Talcott submitted its application for payment on June 1, 1992, in the amount of $106,748.55.  On June 9, P&D's Architect certified only $83,141.50 for payment.  Subsequently, P&D withheld $70,891.00 from this certified amount.  Talcott argues that P&D chose to withhold this amount, *not* the Architect as provided for in Article 9.5.1, and thus this withholding as well as P&D's reasons for it constituted a breach of contract.  On this basis, Talcott claimed it was relieved from any further obligations to perform under the contract, including the obligation to perform punch list and warranty work.  Talcott relies for this assertion on *King Resources, Inc. v. Oliver*, 2002 MT 301, 313 Mont. 17, 59 P.3d 1172, and *Western Media, Inc. v. Merrick* (1988), 232 Mont. 480, 757 P.2d 1308.

¶32  P&D counters that the District Court and the Special Master's findings and conclusions on this issue should be upheld because there was substantial evidence to support them.  P&D relies on *Rossi v. Pawiroredjo*, 2004 MT 39, ¶ 27, 320 Mont. 63, ¶ 27, 85 P.3d 776, ¶ 27, for the proposition that "we will uphold a district court's findings when there is substantial evidence to support them even when there is also evidence supporting contrary findings."  P&D maintains that because Article 9.5.1, relied upon by the District Court, supports the court's holding, Talcott may not use Article 9.7.1 as a basis for a contrary finding.

¶33  The District Court, looking only to Article 9.5.1, and adopting the findings and conclusions of the Special Master, found:

> Under the contract, Talcott was required to complete work which was warranted for one year from substantial completion.  It was not unusual for

problems to arise which required fixing, and this was the purpose of te contract clause. On March 12, 1993, [P&D employees] completed an eleven month warranty inspection. . . . The report identified numerous items to be corrected; however, Talcott declined to return to do these repairs, as it thought P&D was in default of the contract, and therefore P&D either made the repairs or had a third party do so. These repairs cost $7,988.33 . . . . The total costs of work due to punch lists and warranty work was $12,807.33.

¶34 The District Court concluded that Talcott owed P&D this amount for failing to perform the punch list and warranty work. We disagree.

¶35 It is well-established that when construing a contract, the role of the court is "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Section 1-4-101, MCA. In determining the obligations of the parties under this contract, the District Court was required to look at the entire contract; and, specifically, at all relevant provisions. It was obligated to construe Articles 9.5 and 9.7 together in a manner, if possible, to give effect to both clauses. In relying exclusively on the provisions in Article 9.5, the District Court failed to do this.

¶36 The Architect, P&D, and Talcott, were given express and unambiguous responsibilities in the contract. Article 9.5 unequivocally authorized the Architect exclusively, *not* P&D, to certify payment to Talcott based on specific criteria being met. The Architect did this and submitted to P&D his Certificate of Payment for approximately $83,000.00 to be paid to Talcott. Article 9.7 also unequivocally required P&D to pay Talcott "the amount certified by the Architect or awarded by arbitration" by June 25. P&D failed to

12

do so.  Further, Article 9.7 expressly set out Talcott's recourse should the Architect or P&D fail to comply with the contract's payment terms—"upon seven . . . days' written notice to [P&D] and Architect, [Talcott may] stop the Work until payment of the amount owing has been received."  Upon refusal by P&D to pay the amount certified by the Architect, Talcott exercised its express rights under Article 9.7 of the contract and stopped work.  Under our case law, P&D's failure to pay constituted a material breach which relieved Talcott from further performance under the contract.

¶37    In *King Resources*, we held that, when one party to a complicated real estate transaction failed to abide by the contract's terms, a material breach of contract occurred, thus entitling the other party to unilaterally suspend its performance.  *King Resources*, ¶ 32.  Likewise, in *Western Media,* we explained that the maxim of jurisprudence—"no one can take advantage of his own wrong"—meant that a "party who breaches a contract cannot claim entitlement to the contract's benefits after such breach."  *Western Media*, 232 Mont. at 485, 757 P.2d at 1312.  Here, Talcott provided the materials and labor as required by the contract.  When P&D refused to pay Talcott in accordance with the Architect's certification, Talcott was entitled to stop performance under the contract.  In this case the only remaining performance was punch/warranty work.  Because Talcott was justified in declining to complete the punch/warranty work due to the contract breach, we conclude the court erred in penalizing Talcott by requiring it to reimburse P&D for the amounts it either expended on its own or paid to third parties to perform this work.  We therefore vacate the award of $12,807.33 in favor of P&D and against Talcott.

13

¶38    *Did the District Court err in refusing to approve prejudgment interest on the amount Talcott is entitled to recover under its construction lien?*

¶39    We next address Talcott's claim that the District Court erred in denying prejudgment interest on the amount of Talcott's claim requested in the construction lien.  Talcott notes that while the contract required P&D to pay prejudgment interest from the date the payment was due, *i.e*., June 25, 1992, it will accept July 15, 1992, the date on which it filed its construction lien, as an acceptable accrual date pursuant to *DeVoe v. Gust. Lagerquist & Sons, Inc.* (1990), 244 Mont. 141, 145, 796 P.2d 579, 581.  In *DeVoe*, we determined that the date on which Lagerquist filed its construction lien was a proper accrual date from which prejudgment interest could be calculated.  Talcott argues that, in addition to the fact that the contract calls for prejudgment interest, § 27-1-211, MCA, and relevant case law also authorize such interest.

¶40    Section 27-1-211, MCA, entitles a person to prejudgment interest if the following three criteria are established:  (1) the existence of an underlying monetary obligation; (2) the amount of recovery is certain or capable of being made certain by calculation; and (3) the right to recover the obligation vests on a particular day.  *Ramsey v. Yellowstone Neurosurgical Assocs.*, 2005 MT 317, ¶ 19, 329 Mont. 489, ¶ 19, 125 P.3d 1091, ¶ 19.  P&D argues that because the claim was always in dispute, Talcott cannot satisfy the criteria.

¶41    Talcott relies on *Price Bldg. Service, Inc. v. Holms* (1985), 214 Mont. 456, 693 P.2d 553, to support its claim for prejudgment interest notwithstanding P&D's challenge to the amount of Talcott's claim.  In *Price*, we rejected the argument that prejudgment interest can

14

be awarded only where there is an account stated or where there is a fixed contract price. We stated that the statute "merely requires that the damages be certain, or capable of ascertainment by calculation." *Price*, 214 Mont. at 467, 693 P.2d at 559. Moreover, we noted that "[a] dispute on the amount owed on part or all of a claim in the form of a denial of part or all of the amount owed, or in the form of a counterclaim for construction delay and defective performance, does not transform a plaintiff's claim into one that does not bear prejudgment interest." *Price*, 214 Mont. at 467, 693 P.2d at 559. Talcott points out that in both *Safeco Ins. Co. v. Lovely Agency* (1985), 215 Mont. 420, 425, 697 P.2d 1354, 1357, and *Byrne v. Terry* (1987), 228 Mont. 387, 391, 741 P.2d 1341, 1343, we adopted *Price's* rationale.

¶42    P&D counters that Talcott's damages were not only disputed but also were not "certain or capable of being made certain by calculation" prior to judgment. P&D argues that the amount sought in Talcott's construction lien was "based on extra items, such as lost profits, additional cost and supplies, and delay costs rather than on a specified contract price." These "uncertain" costs, according to P&D, distinguish this case from *DeVoe* in which Lagerquist sought an amount certain specified in the parties' contract. As a result, P&D maintains, Talcott is not entitled to prejudgment interest.

¶43    P&D relies on *Maddux v. Bunch* (1990), 241 Mont. 61, 784 P.2d 936, in which we concluded that a disparity between claimed damages and the damages actually awarded meant Maddux failed to show that his damages were "capable of being made certain by calculation," and, therefore, prejudgment interest was not appropriate. *Maddux*, 241 Mont. at

15

67-68, 784 P.2d at 940 (citations omitted). P&D asserts that because Talcott's lien sought $143,912.81 but the District Court awarded damages of only $58,083.31, our holding in *Maddux* precludes the approval of prejudgment interest for Talcott.

¶44 We are not persuaded by P&D's argument that the difference between Talcott's lien and the damages actually awarded (as modified herein) precludes the approval of prejudgment interest under *Maddux*. Three considerations guide this conclusion. First, the contract itself specifies that prejudgment interest be paid. *See* ¶ 9(E). Second, as is more fully demonstrated below, the unsatisfied portion of Talcott's lien award is comprised of "amounts capable of being made certain." Finally, as we noted in *Price*, "the objective of fully compensating the injured party, and that is the primary objective of the prejudgment interest statute, should predominate over other equitable considerations. If the legislature has chosen to provide a right to prejudgment interest (§ 27-1-211), the primary objective of the courts, where possible, should be to award prejudgment interest." *Price*, 214 Mont. at 469, 693 P.2d at 560.

¶45 With the foregoing in mind, we now turn to the components of Talcott's lien claim. First, Talcott seeks recovery of $38,640.00 for the wrongfully charged delay penalty. Article 6.2.3 specifically states: "Costs caused by delays or by improperly timed activities or defective construction shall be borne by the party responsible therefor." Both the Special Master and the District Court concluded that the delays in completing the project were caused by P&D, *not* Talcott. Therefore, the per-day penalty established in the contract should not have been assessed against Talcott. The delay penalty of $38,640.00 withheld by

16

P&D was owed to Talcott on the day it submitted its June statement. This amount is certain and should be paid to Talcott, together with prejudgment interest accrued since July 15, 1992. *See* ¶ 39.

¶46 Similarly, the Special Master and the District Court concluded that Talcott painted the exterior of the new buildings in accordance with the contract specifications. Therefore, $15,000.00, representing the cost to repaint the building, should not have been withheld by P&D. Again, Talcott was entitled to its painting fee at the time Talcott's statement was submitted to P&D. P&D must therefore pay this amount with interest from July 15, 1992, in order to make Talcott whole.

¶47 As we determined above, it was also error for P&D to withhold $10,000.00 from Talcott's June 1992 statement because it surmised Talcott would not return to the job site to complete punch list and warranty work. As with the penalty payment and the painting payment, these amounts were certain amounts due to Talcott under the contract. P&D owes Talcott this $10,000.00 plus interest since the day the construction lien was filed. Additionally, the $2,807.33 that P&D claimed it paid for warranty/punch list work was erroneously deducted from Talcott's judgment by the District Court. Talcott is entitled to a credit for this amount.

¶48 Lastly, the evidence supports the District Court's conclusion that P&D and Talcott orally agreed that Talcott would perform requested changes to some of the units' specifications and would be paid for these changes. P&D erroneously withheld payment for

17

these legitimately-made revisions. The $7,250.64 cost of the changes was certain and Talcott is entitled to prejudgment interest on this amount from July 15, 1992.

¶49    We also address Talcott's request for post-judgment interest on these amounts. Rule 31, M.R.App.P., states:

> If a judgment for money in a civil case is affirmed, whatever interest is allowed by law shall be payable from the date the judgment was rendered or made in the district court. If a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to allowance of interest.

¶50    In *Woods v. Burlington Northern and Santa Fe*, 2004 MT 384, 325 Mont. 106, 104 P.3d 1045, we held that under Rule 31, M.R.App.P., "in those cases in which a judgment for money in a civil case is affirmed, whatever interest is allowed by law shall be payable from the date the judgment was entered in the district court." *Woods*, ¶ 6. In the case before us, the District Court expressly stated in its July 15 Judgment that Talcott was entitled to $58,083.31 with 10% interest per annum "from the date of this Decree." We therefore hold that Talcott is entitled to post-judgment interest on $58,083.31 from July 15, 1999.

¶51    Talcott is also entitled to post-judgment interest from the date of the Decree forward on the $10,000 erroneously withheld by P&D for punch list/warranty work, as well as on the additional $2,807.33 it was ordered to credit to P&D for the cost of the extra punch list/warranty work. These sums were discreetly identifiable amounts sought by Talcott in the District Court but wrongly allocated in the court's judgment. The award of post-judgment interest with respect to the $10,000 comports with the contract provisions, and

the award of such interest as to both amounts comports with § 27-1-211, MCA, as noted above. *See* ¶ 44. It also prompts us to clarify a portion of our holding in *Woods*.

¶52   In *Woods*, ¶ 9, we stated the following with respect to an award of post-judgment interest in those cases in which the net result on appeal was an increase over the amount of the judgment entered in the district court:

> In those cases in which a money judgment is modified or reversed by this Court, with the result that the money judgment is increased over that entered by the district court, the amount representing the increase shall bear interest from the date the new judgment is entered on remand pursuant to this Court's direction . . . .

A literal reading of this language would suggest that, even in those instances where the increased amount of the award was discreetly identifiable, and was sought and wrongly refused in the court below, the party recovering the amount on appeal could not receive post-judgment interest from the date of the erroneous judgment, even though he was otherwise entitled pursuant to contract or statute to the amount in question. Such an interpretation would deprive a party wrongfully denied an award of special damages in the district court of the interest to which he would have been entitled—*i.e.*, interest from the date of judgment— had the District Court properly assessed the damages. We therefore take this opportunity to clarify ¶ 9 of *Woods*, and hold that, in those instances where the amount of the judgment entered in the district court is increased by this Court as a result of an appeal, and the amount of the increase equates to an amount sought by the prevailing party but wrongly denied by the district court, such amount will bear interest from the date of the district court's decree or judgment from which appeal is taken.

19

¶53　*Did the District Court err in refusing to award Talcott overhead costs which it claimed resulted from P&D-responsible delays?*

¶54　In Talcott's Complaint, Talcott sought additional damages to cover its extended costs for office overhead occasioned by the delays caused by P&D. Talcott asserts that it is entitled to these costs based on the contract provision requiring delay costs to be borne by the responsible party. It further claims that its accountant's testimony as to the amount of such delay-related overhead was uncontroverted, and therefore the Special Master's finding that the testimony was not credible was clearly erroneous.

¶55　P&D challenged the method of calculation used by Talcott's accountant, claiming that Talcott had not established the requisite foundation that the method used was in accordance with generally accepted accounting procedures. P&D also elicited testimony from the accountant that office overhead continues whether the company has business or not, and that the contract had no express provision for charging additional overhead based upon delays.

¶56　The Special Master determined that Talcott had failed to establish that it was entitled to additional home office overhead as a result of problems or delays at the job site. The Special Master concluded that the evidence submitted in support of this claim was not credible nor did it establish any specific amount due by a preponderance of the evidence. While we make no finding as to credibility, we agree that the evidence was insufficient to establish entitlement to additional home office overhead. We therefore affirm the District Court's adoption of the Special Master's resolution of this issue.

¶57　*Did the District Court err in its award of fees to Talcott?*

¶58 Lastly, Talcott argues that the District Court erred when it reduced the amount of attorney fees Talcott requested. In July 1999, after the District Court issued its Order modifying and adopting the Special Master's findings and conclusions, Talcott filed its Memorandum of Costs and Disbursements. It sought $2,399.30 in costs and $66,390.50 in attorney fees. Additionally, Talcott submitted a third-party affidavit from an experienced Montana attorney in which the affiant averred that the attorney fees Talcott was seeking were reasonable. P&D moved to have Talcott's request for costs and fees stricken as untimely, statutorily unauthorized, unreasonable under the circumstances, or unsupported by the evidence. P&D also submitted an affidavit from another Montana attorney opining that Talcott's requested fees were unreasonable and excessive.

¶59 In the court's September 1999 fee Order, it noted that § 71-3-124, MCA, authorizes a court to award "reasonable attorney fees" to a claimant whose lien is established. It determined, however, that Talcott's affidavit of legal fees did not differentiate between fees charged to foreclose its construction lien, and fees incurred in presenting its *quantum meruit* claim and defending against P&D's counterclaim. The District Court, therefore, refused to approve the fees sought at that time and instructed Talcott to file a second affidavit in support of its request for attorney fees.

¶60 Talcott submitted its amended affidavit for attorney fees seeking $62,831.00 for fees associated with the lien foreclosure aspect of the case. P&D objected. The District Court held an evidentiary hearing in October 2001. Counsel for both Talcott and P&D were present and counsel for Talcott was extensively questioned and cross-examined on the legal

21

bills generated by him and his firm. Additionally, a local experienced attorney testified at the hearing that Talcott's attorney hours and fees were reasonable for a case of this complexity. After the close of the hearing, P&D submitted for the first time an affidavit in electronically recorded format. Talcott's attorney objected, claiming that the affiant should be sworn and testify at the evidentiary hearing and that an electronic affidavit was not the "best" evidence. The District Court judge accepted the affidavit anyway and invited the parties to submit post-hearing proposed findings. In Talcott's post-hearing proposed findings filed later that month, Talcott sought $88,370.00 in legal fees, claiming more legal hours than had been claimed previously, and higher hourly rates for both the attorney and paralegal working on the case.

¶61 Approximately nineteen months later, in May 2003, the District Court issued its Findings of Fact, Conclusions of Law and Order on [Talcott's] Memorandum of Costs and Attorney Fees. Despite acknowledging that Talcott had paid its attorney between $66,000.00 and $68,000.00 in legal fees, the court determined that "[t]he hours reported and the attorney fees claimed [by Talcott] are not supported by credible evidence and do not appear to be reasonable." The District Court then determined that Talcott's fees should be limited to one and one-half times the hours expended by *P&D's legal staff* and ordered that these hours be compensated at the hourly rate in place when the service was provided. The District Court instructed P&D's counsel to submit an affidavit of hours and fees he expended on the lien foreclosure portion of the lawsuit within fifteen days of the court's findings. On May 28,

22

2003, P&D filed the required affidavit. On November 8, 2004, the District Court, based on the claimed legal hours in P&D's affidavit, awarded Talcott $31,731.00 in legal fees.

¶62 We will only disturb a district court's award of attorney fees for an abuse of discretion. An abuse of discretion occurs when the district court judge acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reasoning resulting in substantial injustice. *Renville v. Farmers Ins. Exchange*, 2004 MT 366, ¶ 24, 324 Mont. 509, ¶ 24, 105 P.3d 280, ¶ 24.

¶63 As indicated above, the applicable statute in this case, § 71-3-124, MCA, authorizes the award of "reasonable attorney fees." The reasonableness of attorney fees must be ascertained under the facts of each case. *Plath v. Schonrock*, 2003 MT 21, ¶ 36, 314 Mont. 101, ¶ 36, 64 P.3d 984, ¶ 36 (citation omitted). This Court has stated that in determining what constitutes reasonable attorney fees, the following factors should be considered as guidelines: (1) the amount and character of the services rendered; (2) the labor, time and trouble involved; (3) the character and importance of the litigation in which the services were rendered; (4) the amount of money or the value of the property to be affected; (5) the professional skill and experience called for; (6) the attorneys' character and standing in their profession; and (7) the results secured by the services of the attorneys. *Plath*, ¶ 36 (citations omitted). These guidelines are not exclusive. The trial court may consider other factors as well. *Plath*, ¶ 36 (citations omitted). Moreover, an award of fees, like any other award, must be based on competent evidence. *First Security Bank of Bozeman v. Tholkes* (1976), 169 Mont. 422, 429, 547 P.2d 1328, 1331 (internal citations omitted).

23

¶64    In *Glaspey v. Workman* (1988), 234 Mont. 374, 377-78, 763 P.2d 666, 668, we stated that "[e]vidence elicited through oral testimony, cross examination, and the introduction of exhibits is competent evidence upon which an attorney's fee award can be based." In the case before us the District Court correctly held an evidentiary hearing before determining the amount of attorney fees to be awarded to Talcott under § 71-3-124, MCA; however, it ultimately premised Talcott's legal fee award on an affidavit that was not submitted until nineteen months *after* the hearing, and upon which Talcott had no opportunity to hear testimony or cross-examine. While we acknowledge that Talcott's counsel presented confusing and conflicting evidence of its legal fees, this does not justify the District Court's reliance upon a document that does not constitute competent evidence. The court's reliance on P&D's affidavit to establish Talcott's legal fees was an abuse of its discretion. We therefore reverse the District Court's award of $31,731.00 in legal fees and remand for a hearing in which the parties have equal opportunity to present and hear relevant testimony, to introduce relevant exhibits and to undertake necessary cross-examination.

¶65    As we stated in *Donnes v. Orando* (1986), 221 Mont. 356, 362, 720 P.2d 233, 238, "[t]ime spent determining attorney fees is as much a part of the case as establishing the lien." Pursuant to *Donnes*, we vacate the District Court's conclusion that Talcott is not entitled to attorney fees incurred after the entry of the court's July 15, 1999 Judgment, and instruct the court on remand to determine and award to Talcott reasonable attorney fees for the time expended in establishing and determining its attorney fees.

24

¶66    Lastly, Talcott is entitled to post-judgment interest on its legal fees from the date of the original judgment in which the District Court held that Talcott should receive legal fees in an amount "to be determined." In its July 15, 1999 Judgment, the District Court expressly provided that Talcott was entitled to its then-undetermined costs and legal fees which, when determined and paid, would be entitled to 10% interest from the date of judgment, *i.e.*, July 15, 1999.

¶67     For the foregoing reasons, we affirm in part and reverse and remand in part for further proceedings in accordance with this Opinion.


/S/ PATRICIA COTTER


We Concur:

/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE