DA 24-0632

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 269

FILED

11/25/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0632

RUSSELL WADDELL and CASEY MAGAN,

     Plaintiffs and Appellants,

  v.

PAUL STUDER, RACHAEL STUDER, and the
SUMMER RIDGE HOMEOWNERS' ASSOCIATION,
a Montana non-profit corporation,

     Defendants and Appellees.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV-2020-1267A
Honorable Peter B. Ohman, Presiding Judge

COUNSEL OF RECORD:

     For Appellants Russell Waddell and Casey Magan:

          Michael G. Eiselein, Eiselein Law Firm, Bozeman, Montana

     For Appellees Paul and Rachael Studer:

          Michael L. Rabb, Jeffrey Driggers, The Rabb Law Firm, PLLC, Bozeman,
Montana

     For Appellee Summer Ridge Homeowners' Association:

          G. Patrick HagEstad, David J. HagEstad, Brien B. Birge, HagEstad Law
Group, PLLC, Missoula, Montana

               Submitted on Briefs:  May 28, 2025

                    Decided:  November 25, 2025

Filed:

_____
               Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Russell Waddell and Casey Magan (collectively, the Waddells) appeal from a series of orders issued by the Eighteenth Judicial District Court, Gallatin County. The District Court's orders stem from a dispute between the Waddells and Paul and Rachael Studer (the Studers) regarding the location where the Studers planned to build their home as it related to the views from the Waddells' residence in the Summer Ridge Homeowners' Association (SRHOA). In relevant part, the court's orders denied the Waddells' request for a temporary restraining order (TRO), denied the Waddells' request for a preliminary injunction, granted summary judgment to the Studers and SRHOA, and ordered the Waddells to pay the attorney fees of the Studers and SRHOA.

¶2 We address the following restated issues on appeal:

1. *Should this Court review the Waddells' challenges to the District Court's orders denying preliminary relief when the District Court has issued a final judgment on the merits?*

2. *Whether the District Court erred by granting summary judgment in favor of the Studers and SRHOA.*

3. *Whether the District Court abused its discretion by granting an award of attorney fees to the Studers and SRHOA.*

¶3 We determine the District Court's orders denying preliminary relief have been merged into the court's final judgment and need not be separately addressed, reverse the District Court's summary judgment and attorney fee awards, and remand for further proceedings consistent with this Opinion.

2

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     In 2004, the Waddells bought a home located on Lot 7 in the Summer Ridge Subdivision. That home was built in 1994 as one of the first homes in the subdivision and is located on the southern portion of Lot 7. Summer Ridge Subdivision is subject to a Declaration of Protective Covenants and Restrictions (Covenants) which were recorded on December 9, 1993. Anyone who purchases property in the subdivision is a member of the SRHOA and obligated to comply with and be bound by the Covenants. As relevant here, the Covenants provide that building placement "should take into consideration the location of roads and neighboring dwellings, with allowance for views and solar gains"; that "[a]pproval of size and height shall take into consideration unusual designs, blocking views, and solar effects of existing dwellings"; and requires a minimum front setback of 50 feet from the roadway easement line, a minimum side setback of 30 feet from the side property line, and a minimum rear setback of 50 feet from the rear property line. SRHOA has a Design Review Committee (DRC) which reviews building plans to enforce compliance with the Covenants.

¶5     In 2018, the Studers purchased Lot 6 in the subdivision, located next to the Waddells' property. Lot 6 was an empty lot with no home built on it, and the Studers submitted plans for the building of their home to the DRC on September 30, 2020. The plan called for a home to be built on the northern portion of Lot 6. While the plan included a drawing of the existing residence on the adjacent Lot 5, it did not include a drawing of the Waddells' existing residence on the adjacent Lot 7. The DRC approved the Studers'

3

proposed plan on October 7, 2020. On October 15, 2020, the Studers submitted revised plans which reduced the square footage of the residence. The DRC approved the revised plan that same day. On October 26, 2020, the Waddells contacted SRHOA objecting to the Studers' proposed plan and requesting approval be rescinded because the Studers' home would block the Waddells' view of the Bridger Mountains. On October 30, 2020, the SRHOA Board of Directors sent a letter to the Studers informing them the DRC's approval of the proposed plan had been rescinded and that "[n]o further action regarding construction on your lot is allowed" because the Board determined the plan "fail[ed] to consider the impact on" the Waddells' residence, "particularly its view shed toward the Bridger Mountain range." The Board sent further letters to the Studers on October 31 and November 1, 2020, requiring the Studers to submit a new drawing to help evaluate the impacts of the proposed Lot 6 residence on the views of the existing Lot 7 residence. The letters directed the Studers to resubmit a revised plan to the DRC by no later than November 15, 2020.

¶6    The Studers sent the Board a letter on November 4, 2020, informing the Board it would rely on the previous approvals of their plan—rejecting the Board's recission letters—and were scheduled to break ground on November 20, 2020. The Waddells proposed the Studers move their proposed residence 100 feet to the south on November 9, 2020. The Studers sent another letter to the SRHOA on November 12, 2020, offering to move the proposed house south by 20 feet if the SRHOA would pay the $1,000 expense to re-stake the property. The Waddells rejected this proposal, noting that "without the

4

requested plans showing our home in relation to the offered 20-foot move, it is impossible to know if 20 feet will cure the unfair obstruction of our views the proposed construction will cause." The Board sent the Studers another letter on November 17, 2020, two days after its previously-imposed deadline, informing them the Board was going to "leave this issue for the two parties to work out between yourselves." The Board withdrew its request for the Studers to resubmit a construction plan and reinstated approval to proceed with construction.

¶7 On November 20, 2020, the Waddells filed their Complaint in the District Court, seeking preliminary and permanent injunctive relief, a declaratory judgment, and a TRO enjoining the Studers from building the home at the planned location on Lot 6. The District Court denied the TRO request that same day. On December 2, 2020, the Waddells filed an Amended Complaint naming the SRHOA as a defendant. The District Court held a show cause hearing on the preliminary injunction request on December 4, 2020. The court issued its order denying the Waddells' request for a preliminary injunction on December 31, 2020. The court addressed the Covenants in its order, determining the Covenants "do not create an obligation on members to build a new residence in a manner which does not infringe on another member's view shed" because the Covenants only "encourage homeowners to consider the views of their neighbors—in essence to be good neighbors—but do not set any limitations beyond that" based on the "discretionary terms of 'should' and 'consider' when discussing the submission and approval of building plans." Essentially, the court determined no duty existed on either the Studers or SRHOA "to protect view sheds above

5

and beyond the size, height, and set back requirements." The Waddells did not immediately appeal the District Court's denial of their preliminary injunction request.

¶8 Litigation between the parties continued apace following the District Court's denial of the preliminary injunction. Over the next three-plus years, the register of actions in the case would grow to 393 entries as the parties filed numerous motions—discovery motions, motions for summary judgment, motions in limine, motions for sanctions, etc. As relevant here, the District Court granted the Studers' motion for summary judgment on January 4, 2022, and SRHOA's motion for summary judgment on April 25, 2022. In granting those motions, the District Court again set forth its interpretation of the Covenants as only requiring compliance with the mandatory size, height, and setback requirements based on the discretionary language around consideration of views and determined the Studers and SRHOA had, in fact, considered the Waddells' views. On May 31, 2023, the court issued a series of orders resolving the last of the issues raised by the parties which awarded judgment in favor of the Studers and SRHOA. SRHOA filed a motion requesting its attorney fees on June 15, 2023, and the Studers filed a motion requesting their attorney fees on June 21, 2023. The Waddells objected to both motions for attorney fees and the District Court held a hearing on the reasonableness of the fees requested. Ultimately, on October 2, 2024, the District Court issued its Order re: Defendants' Claims for Attorneys' Fees. The court awarded SRHOA $305,143.50 in attorney fees and $13,492.91 in costs, and awarded the Studers $98,765.96 in attorney fees and $206.06 in costs. The court issued its Final Judgment, reflecting the dismissal of all of the Waddells' claims and judgment in favor of

6

the Studers and SRHOA as well as the cumulative $417,608.37 attorney fee and costs awards, with post-judgment interest.

¶9	The Waddells appeal.  Additional facts will be discussed as necessary below.

## STANDARD OF REVIEW

¶10	We review the grant or denial of injunctive relief for a manifest abuse of discretion. *Larsen v. Sayers*, 2025 MT 24, ¶ 14, 420 Mont. 270, 563 P.3d 269 (citing *Davis v. Westphal*, 2017 MT 276, ¶ 10, 389 Mont. 251, 405 P.3d 73).  A manifest abuse of discretion is one that is obvious, evident, or unmistakable.  *Flying T Ranch, LLC v. Catlin Ranch, LP*, 2020 MT 99, ¶ 7, 400 Mont. 1, 462 P.3d 218 (*Flying T I*).

¶11	We review a district court's grant or denial of summary judgment de novo, applying the same criteria as M. R. Civ. P. 56.  *Mullee v. Winter Sports, Inc.*, 2025 MT 113, ¶ 9, 422 Mont. 180, 569 P.3d 594 (citing *CB1 v. Hove*, 2025 MT 36, ¶ 9, 420 Mont. 380, 564 P.3d 434).  Summary judgment is only appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *CB1*, ¶ 9.

¶12	We review a district court's order granting or denying attorney fees and costs for an abuse of discretion.  *Peters v. Hubbard*, 2020 MT 282, ¶ 9, 402 Mont. 71, 475 P.3d 730 (citing *James Talcott Constr., Inc. v. P. & D. Land Enters.*, 2006 MT 188, ¶ 27, 333 Mont. 107, 141 P.3d 1200).  An abuse of discretion occurs when a district court acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason resulting in substantial injustice.  *Friedel, LLC v. Lindeen*, 2017 MT 65, ¶ 5, 387 Mont. 102, 392 P.3d 141 (citation omitted).

7

**DISCUSSION**

¶13   *1. Should this Court review the Waddells' challenges to the District Court's orders denying preliminary relief when the District Court has issued a final judgment on the merits?*

¶14   The Waddells assert the District Court wrongly determined the merits of the case at the TRO/preliminary injunction stage when it set forth its interpretation of the Covenants. Both the Studers and SRHOA assert the Waddells' appeal of these orders comes too late, as the Waddells did not immediately appeal from the denial of their preliminary injunction request, and the entry of final judgment and construction of the Studers' home on Lot 6 has rendered the issue moot in any case.

¶15   The Waddells did not immediately appeal the December 31, 2020 denial of their request for a preliminary injunction. Such an appeal is authorized by the Montana Rules of Appellate Procedure. *See* M. R. App. P. 6(3)(e) (permitting appeal of "an order granting or dissolving, or refusing to grant or dissolve, an injunction or an attachment"). Instead, the parties litigated the matter for nearly four more years, the Studers built their home as initially planned, and the District Court ultimately granted summary judgment (and entered a final judgment) in favor of the Studers and SRHOA on all claims. While we agree with the Studers and SRHOA that the Waddells could have immediately appealed the denial of their preliminary injunction request, we disagree that all claims arising from the preliminary injunction denial have been mooted because what this Court is tasked with reviewing is whether the District Court's summary judgment orders, and, necessarily, the legal analysis underlying such, are correct. The District Court specifically recognized its

8

legal analysis regarding interpretation of the Covenants from the preliminary injunction decision in its summary judgment orders and it is that interpretation which we are called on to address on appeal.

¶16 In the federal courts, appellate courts recognize and apply the doctrine of merger, wherein interlocutory decisions—such as the denial of a preliminary injunction—become merged with a final decision granting summary judgment. *See Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000). "One of the considerations in entry of a preliminary injunction is the probability of the plaintiffs' success on the merits. Yet on final decision, the district court has decided the merits. To attempt to review the district court's advance assessment of probabilities of plaintiffs' success when the district court has now found in favor of plaintiffs [or defendants] on the merits seems a futile exercise. Good sense dictates that review of the decision on the merits would be more meaningful." *SEC v. Mount Vernon Mem'l Park*, 664 F.2d 1358, 1361 (9th Cir. 1982) (quoting *United States v. Chicago*, 534 F.2d 708, 712 (7th Cir. 1976)).

¶17 We agree with the general federal rule that it makes little sense to "attempt to review the district court's advance assessment of probabilities of plaintiffs' success" in an appeal such as this, where the District Court has already found in favor of the defendants on the merits of the case and "good sense" leads us to review the decision on the merits itself. *See Mount Vernon Mem'l Park*, 664 F.2d at 1361. "The purpose of a preliminary injunction is to prevent further injury or irreparable harm pending an adjudication on the merits." *Flora v. Clearman*, 2016 MT 290, ¶ 21, 385 Mont. 341, 384 P.3d 448. Here, the Studers have

9

already built their home and the case proceeded to an adjudication on the merits through the District Court's summary judgment orders. As such, we need not address the Waddells' contentions specifically related to the denial of the TRO or preliminary injunction as those have necessarily been subsumed into the summary judgment appeal.

¶18    2. *Whether the District Court erred by granting summary judgment in favor of the Studers and SRHOA.*

¶19    The District Court's summary judgment orders determined the Covenants contained no requirement for the Studers' new residence to be built in a manner to preserve the Waddells' views and that it was undisputed the Studers "considered" the Waddells' views when building their home. The Waddells assert the District Court erred in interpreting the words "should" and "consider" from the Covenants, essentially rendering the discussion of preserving views irrelevant, leading to the court wrongly issuing summary judgment in favor of the Studers and SRHOA. The Studers and SRHOA assert the District Court properly interpreted the Covenants and the undisputed factual record demonstrates the views of the Waddells were "considered."

¶20    A district court's interpretation of a restrictive covenant is a conclusion of law reviewed for correctness. *Lewis & Clark Cnty. v. Wirth*, 2022 MT 105, ¶ 14, 409 Mont. 1, 510 P.3d 1206. When interpreting a restrictive covenant, we apply the same rules as those applicable to contract interpretation. *Larsen*, ¶ 18. We interpret covenants to ascertain the intention of the parties, reading the covenant as a whole and giving effect to every part if reasonably practicable. *Larsen*, ¶ 18 (citations omitted). If the language of a covenant "is clear and explicit, we apply the language—using its ordinary and popular meaning—as

10

written." *Larsen*, ¶ 19 (citing *Craig Tracts Homeowners' Ass'n v. Brown Drake, LLC*, 2020 MT 305, ¶ 9, 402 Mont. 223, 477 P.3d 283). "Restrictive covenants should be read together, 'each clause helping to interpret the others,' where '[p]articular clauses of the agreement are subordinate to the general intent of the contract.'" *Wirth*, ¶ 16 (quoting §§ 28-3-202, -307, MCA).

¶21 The Covenants in this case were "for the purpose of maintaining a uniform and stable value, character, architectural design, use, and development of the premises" and are binding on all property owners in the subdivision. The Covenants provide explicit minimum setbacks for a building from the front, sides, and rear of a property. As related to "[b]uilding [o]rientation," the Covenants state that "[p]lacement should take into consideration the location of roads and neighboring dwellings, with allowance for views and solar gains." The Covenants also contain explicit building size and height requirements, regarding the minimum square footage of a residence and prohibiting a structure more than two stories tall, while further stating "[a]pproval of size and height shall take into consideration unusual designs, blocking views, and solar effects of existing dwellings."

¶22 In interpreting the Covenants, the District Court found the use of the term "should" in the building orientation covenant was "used to express the propriety of [considering the views and solar gains of neighbors], but it [did] not create an obligation to do so." The District Court's interpretation—that "should" as used in the Covenants did not create an obligation—was incorrect. While "should" ordinarily expresses discretion, its pairing here

11

"with allowance for views and solar gains," within a covenant that has the declared purpose to preserve uniform value and character renders the term obligatory to the extent of requiring genuine, good faith consideration of neighboring impacts. This construction enforces, rather than enlarges the Covenants' written promise.

¶23    The Covenants' use of the term "should" has caused much confusion in this case, though the Covenants themselves are not ambiguous. Reading the Covenants as a whole, we may apply the plain language—according to its popular meaning—as written. *Larsen*, ¶¶ 18-19. The word "should," like many American English words, is not always a model of clarity as it can be given different meanings depending on its usage. Bryan Garner, editor-in-chief of *Black's Law Dictionary*, for instance, notes that "should," like "may," "is sometimes used to create mandatory standards[.]" *Should*, Bryan A. Garner, *Garner's Dictionary of Legal Usage* (3rd ed. 2011). Though the 12th edition of *Black's Law Dictionary* does not define the term, earlier editions define the term as the "past tense of shall; ordinarily implying duty or obligation; although usually no more than an obligation of propriety or expediency" that "does not ordinarily express certainty as 'will' sometimes does." *Should*, *Black's Law Dictionary* (5th ed. 1979). *See also Should*, *Oxford English Dictionary* (2nd ed. 1989) (defining "should" as the past tense of "shall"). "Both 'shall' and 'must' are mandatory, rather than permissive." *Montco v. Simonich*, 285 Mont. 280, 287, 947 P.2d 1047, 1051 (1997).

¶24    In this case, the language of the Covenants as a whole informs our interpretation of the term. As used in the Covenants, the phrase "with allowance" qualifies or clarifies the

12

phrase "should take into consideration" and supports a construction of the sentence that creates an obligation rather than just an option—in other words, "consideration" has to take account of the "views and solar gains" of existing neighbors. While the Covenants do not require a mandatory "view easement," they do require good faith consideration of the "views and solar gains" of existing neighbors. The Covenants, created for "the purpose of maintaining a uniform and stable value, character, architectural design, use, and development of the premises," require a building being constructed to consider the views and solar gains of existing buildings: "[p]lacement should take into consideration the location of roads and neighboring dwellings, with allowance for views and solar gains." The District Court, focused on the explicit numerical nature of the size, height, and setback requirements, erred by minimizing the allowance for views and solar gains covenant as a discretionary, rather than mandatory, consideration for builders of new residences within the subdivision. "In the construction of an instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Section 1-4-101, MCA. In terms and in substance, the Covenants' use of the term "should" in the building orientation covenant created a mandatory obligation to "take into consideration the location of roads and neighboring dwellings, with allowance for views and solar gains." Here, the Covenants provide requirement on the home builder with regard to building placement—"should take into consideration the location of roads and

13

neighboring dwellings, with allowance for views and solar gains"—and requirement on the SRHOA—that "[a]pproval of size and height shall take into consideration unusual designs, blocking views, and solar effects of existing dwellings" in determining whether to approve the overall design and location of the proposed construction. Read as a whole, both the homebuilder and the SRHOA are required to in good faith consider the impact on neighboring homeowners' views and solar gains in the size and location of proposed building construction.

¶25 The Studers and SRHOA argue that, even if the District Court erred in its interpretation of the Covenants, they were still entitled to summary judgment because the facts demonstrate the parties did "consider" the Waddells' view prior to construction. Analogizing to Auguste Rodin's famous sculpture *The Thinker*, the Waddells contend the Studers' and SRHOA's interpretation of "considering" would allow the construction of a building anywhere, as long as it was within the size, height, and setback requirements, provided the new builder simply said they thought about their neighbors' objections before saying no.

¶26 "While this Court resolves inferences drawn from the factual record in favor of the party opposing summary judgment, mere denial, speculation, or conclusory statements are insufficient to raise genuine issues of material fact." *Arnold v. Yellowstone Mt. Club, LLC*, 2004 MT 284, ¶ 15, 323 Mont. 295, 100 P.3d 137 (citing *Klock v. Town of Cascade*, 284 Mont. 167, 174, 943 P.2d 1262, 1266 (1997)). "A 'material' fact is a fact that 'involves the elements of the cause of action or defenses at issue to an extent that necessitates

14

resolution of the issue by a trier of fact.'" *Arnold*, ¶ 15 (quoting *Mt. W. Bank, N.A. v. Mine & Mill Hydraulics, Inc.*, 2003 MT 35, ¶ 28, 314 Mont. 248, 64 P.3d 1048).

¶27 The factual record of this case demonstrates there may have been some consideration of the Waddells' view when the Studers built their new home, but whether that consideration was sufficient is beyond the scope of the summary judgment record and best left for a jury to determine.[1] The Studers' original plan depicted the home on Lot 5 and their proposed Lot 6 residence, but completely omitted the Waddells' existing home on neighboring Lot 7. Even without the neighboring residence on the plans, which could demonstrate a lack of consideration as it relates to views, the DRC twice approved the Studers' plan. Once the Waddells began to object, the Board rescinded the plan's approval and made it subject to a new drawing which would contain the Waddells' residence to

---

[1] The Dissent claims that "neither party primarily seeks remand for trial[.]" Dissent, ¶ 35. The Waddells did specifically request this Court to "[r]emand the case to the district court with instructions to enter judgment in favor of Plaintiffs or, alternatively[, r]emand the case to the district court *for a jury trial on the merits*, including the merits of the remaining claims, and a prevailing-party fee award." (Emphasis added.) While the Waddells would now prefer this Court to simply enter judgment in their favor, the Waddells did not file a cross-motion for summary judgment below and repeatedly argued both the Studers and SRHOA "misrepresent[ed] essential facts" in support of their respective motions for summary judgment. And, in any event, whether the Waddells prefer entry of judgment in their favor rather than remand for trial is immaterial to our review of the case. It is readily apparent by their briefing on appeal that the parties disagree on the meaning of material facts as it relates to the "consideration" given by the Studers and SRHOA in this case. Even if the Waddells had filed a cross-motion for summary judgment and asserted no material facts were in dispute, which they did not in the proceedings below, the District Court would still have been required to "evaluate each party's motion on its own merits." *Kilby Butte Colony, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2017 MT 246, ¶ 7, 389 Mont. 48, 403 P.3d 664 (citing *Hajenga v. Schwein*, 2007 MT 80, ¶ 18, 336 Mont. 507, 155 P.3d 1242). Even when both parties move for summary judgment, asserting material facts to not be in dispute, that "does not establish, in and of itself, the absence of genuine issues of material fact." *Hajenga*, ¶ 18 (quoting *Mont. Metal Bldgs., Inc. v. Shapiro*, 283 Mont. 471, 477, 942 P.2d 694, 698 (1997)).

15

determine the effect the new construction would have on their existing views. The Board gave a deadline for a revised plan, which came and went without any revisions, before again reinstating approval based on the plan which did not show the Waddells' existing residence.[2] The Waddells requested the Studers move their proposed residence back 100 feet, which the Studers responded to with an offer to move back 20 feet. The Waddells rejected this proposal, noting that "without the requested plans showing our home in relation to the offered 20-foot move, it is impossible to know if 20 feet will cure the unfair obstruction of our views the proposed construction will cause." The Studers never made revised plans which would show the Waddells' home, did not move an inch, and constructed their home in the originally-planned location. Whether these actions (and inactions) constituted "tak[ing] into consideration" the Waddells' existing residence and allowing for views and solar gains as required by the Covenants is a question for the fact-finder and not one which can be answered by a court at the summary judgment stage.

---

[2] In its letter reinstating the Studers' approval to build their proposed residence, the Board noted its intention—presumably referring to its multiple letters rescinding approval because the Studers' plan "fail[ed] to consider the impact" on the Waddells' views and requiring the Studers to submit a revised plan which would specifically show the Waddells' Lot 7 residence "to help evaluate the existing views" for compliance with the Covenants—was to "try and do its best to help resolve the disagreement" between the Waddells and Studers but had "come to realize that the wisest approach is to leave this issue for the two parties to work out between yourselves." The Covenants require the SRHOA to consider views when determining whether to approve a proposed building and provide that if a homebuilder's plan doesn't adequately take into consideration the views from existing residences, the SRHOA must—essentially, the SRHOA is the final check on a homebuilder. Phrasing compliance with the Covenants (a mandatory obligation for both the builders and the SRHOA) as a "disagreement" to be left for the Waddells and Studers to work out between themselves could conceivably demonstrate a lack of consideration by the SRHOA as to whether the Studers' plan did comply with the Covenants in this case, but this is a question for the fact-finder on remand and not one to be determined by this Court on appeal.

¶28    While the Dissent asserts the Court is "over-complicat[ing] this proceeding" by remanding for a jury trial, Dissent, ¶ 43, the Dissent's recitation of the undisputed factual record, Dissent ¶¶ 41-42, which it contends is sufficient for this Court to issue a final decision on the merits, is remarkably incomplete. Completely unmentioned by the Dissent are the three letters sent by the SRHOA rescinding the Studers' approval to build which informed the Studers their plan "fail[ed] to consider the impact" on the Waddells' views as required by the Covenants and required the Studers to submit a revised plan which would specifically show the Waddells' Lot 7 residence "to help evaluate the existing views" for compliance with the Covenants by November 15, 2020. The Studers did not comply with the Board's requirement to submit a revised plan which would specifically allow it to "evaluate the [Waddells'] existing views" for compliance with the Covenants. In response to this non-compliance, and without review of a plan showing the impact on the Waddells' existing views, the Board simply reinstated approval for the Studers to build because it wanted to stay out of the dispute and had "come to realize that the wisest approach is to leave this issue for the two parties to work out between yourselves." The Dissent latches onto the phrase "upon further deliberation" from the November 17, 2020 letter from the Board, asserting it constitutes undisputed evidence the Board and Studers considered the effect on the Waddells' views. Dissent, ¶ 42. Once again, this analysis is incomplete. In context, the phrase "upon further deliberation, the Board is withdrawing its request for [the Studers] to resubmit a construction plan" the Dissent contends is so important immediately follows the Board's statement that it "has come to realize that the wisest approach is to

17

leave this issue for the two parties to work out between yourselves," and precedes the Board's offer to pay a re-staking fee "in order to avoid a dispute," which would also "require a release of liability" prior to payment. It is an undisputed material fact that the Board sent the Studers a letter reinstating approval to build their home without requiring them to resubmit a revised building plan showing the Waddells' existing residence which the Board had previously requested on three separate occasions. The import of that fact—whether the Board in good faith considered the Waddells' views without seeing a plan depicting such or whether the Board simply sought to remove itself from the dispute rather than enforce the Covenants as required—is exactly the type of question which must be presented to the fact-finder and not one which can be answered by a court at the summary judgment stage.

¶29 Ultimately, this matter is not susceptible to summary judgment as the District Court misinterpreted the Covenants and the factual determination of whether the Studers and SRHOA sufficiently considered the impact of the construction on the Waddells' views is best left to a jury to decide.

¶30 *3. Whether the District Court abused its discretion by granting an award of attorney fees to the Studers and SRHOA.*

¶31 "Montana generally follows the American Rule regarding attorney fees, 'where each party is ordinarily required to bear his or her own expenses absent a contractual or statutory provision to the contrary.'" *Mlekush v. Farmers Ins. Exch.*, 2015 MT 302, ¶ 10, 381 Mont. 292, 358 P.3d 913 (*Mlekush I*) (quoting *Winter v. State Farm Mut. Auto. Ins. Co.*, 2014 MT 168, ¶ 31, 375 Mont. 351, 328 P.3d 665). "Contractual fee-shifting provisions are a

18

recognized exception to the American Rule that a party generally pays its own attorneys' fees." *Houden v. Todd*, 2014 MT 113, ¶ 41, 375 Mont. 1, 324 P.3d 1157 (citation omitted). In this case, the Covenants provide that any "Lot Owner, Declarant, or the Association" may sue to enforce the covenants and "[i]n the event of any action to enforce these covenants, the prevailing party shall be entitled to costs and reasonable attorney's fees to be set by the court."

¶32 The District Court awarded just shy of $420,000 in attorney fees to the Studers and SRHOA as the prevailing parties. Based on our reversal of the District Court's summary judgment orders and remand for trial, however, the Studers and the SRHOA are no longer the prevailing parties as contemplated by the Covenants. Any determination of "prevailing party" must necessarily wait until the jury determines who wins this case. As such, there is no longer a basis for the attorney fee award and it is reversed.

## CONCLUSION

¶33 The District Court erred by granting summary judgment to the Studers and SRHOA based on its interpretation of the Covenants and the matter must be remanded for a jury to determine whether the Studers and SRHOA sufficiently considered the impact on the Waddells' views. Because there is no prevailing party at this time, there is no basis for an attorney fee award and the District Court's attorney fee award in favor of the Studers and SRHOA is reversed.

¶34 Reversed and remanded.

/S/ INGRID GUSTAFSON

19

We Concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ KATHERINE M. BIDEGARAY
/S/ JAMES JEREMIAH SHEA

Justice Jim Rice concurring in part, dissenting in part.

¶35 In my view, the Court employs an incorrect analysis, reasoning that "should" is a "past form of shall" that "creates an obligation rather than just an option" in the same or similar way that mandatory language would. Opinion, ¶¶ 23, 24 ("'should' in the building orientation covenant created a mandatory obligation"). More critically, the Court imposes an obligation upon the Studers that I believe is beyond what the Covenants do by defining "consider" beyond its plain meaning, and remands for a jury to declare exactly what that obligation is, reasoning that the question is "best left" for a jury. Opinion, ¶ 27 ("whether that consideration was sufficient is . . . best left for a jury to determine"). However, the question of what a contract or covenant requires, specifically here—the amount or kind of "consideration" of viewshed that is required—is a threshold interpretational question, a matter of law to be reviewed de novo for correctness. *Brandt v. R&R Mountain Escapes, LLC*, 2025 MT 155, ¶ 10, 423 Mont. 100, 572 P.3d 809. Once a court interprets the document as a matter of law, determining what the contract or covenant requires, then the factual record is reviewed to determine whether there was a breach of that obligation. If there are genuine conflicts in material facts, a jury must resolve those factual issues and

20

determine whether the contract was breached. However, if the record contains no genuine conflicts in material facts, then summary judgment is appropriate. Here, neither party primarily seeks remand for trial, and neither identifies conflicts in material facts, because there are none.[1] This is a decision of law for the Court to make. I believe the District Court interpreted the covenants correctly as a matter of law, and then, correctly reasoning that there were no remaining material issues of fact, properly entered summary judgment.

¶36 As the Court recognizes, "[w]here the language of a covenant is clear and explicit, the Court must apply the language as written." *Creveling v. Ingold*, 2006 MT 57, ¶ 8, 331 Mont. 322, 132 P.3d 531 (citing *Wurl v. Polson Sch. Dist. No. 23*, 2006 MT 8, ¶ 16, 330 Mont. 282, 127 P.3d 436). Such language "should be understood in its ordinary and popular sense." *Creveling*, ¶ 10 (citing *Fox Farm Estates Landowners v. Kreisch*, 285 Mont. 264, 268, 947 P.2d 79, 82 (1997)). This Court employs principles of contract law when interpreting restrictive covenants, *Lewis and Clark Cnty. v. Wirth*, 2022 MT 105, ¶ 16, 409 Mont. 1, 510 P.3d 1206 (citing *Hillcrest Homeowners Ass'n v. Wiley*, 239 Mont. 54, 56, 778 P.2d 421, 422 (1989)), and covenants are to be read as a whole, "each clause helping to interpret the others." Section 28-3-202, MCA. The Waddells argued to the

---

[1] While the Waddells list an alternative request for remand for a jury trial at the end of their reply brief, the thrust of the arguments through the entirety of their briefing is for reversal of summary judgment and a judgment in their favor on the merits, as articulated in their summary of argument: "The District Court's Summary Judgments as to all of the Plaintiffs' claims are the product of the same errors of law and should be vacated with instructions to enter judgment in favor of the Waddells." Also, in their briefing: "This Court has the power to remand the case to the District Court with instructions to enter judgment in Waddells' favor." And: "Appellants Waddell and Magan respectfully request that this Court[] . . . [r]emand the case to the district court with instructions to enter judgment in favor of Plaintiffs."

District Court that the Covenants were ambiguous, but I agree with the Court, and the District Court, that they are not. Indeed, when viewed in totality, they clearly delineate specific express requirements on the one hand, and contrasting general, or nonspecific, requirements on the other—"each clause helping to interpret the other[]." Section 28-3-202, MCA.

¶37 Within the "Site" Covenants, express structural setback requirements are provided in Section 1, including a front setback of a 50-foot minimum from roadway easements and any other structure, a side setback of at least 30 feet from the side property line, and a rear setback of at least 50 feet from the rear property line. These are mandatory requirements that restrict the location of a structure on any lot.

¶38 Then, additionally within the "Site" Covenants, Section 2 provides that, in addition to the express siting requirements stated above, the placement of a structure "should *take into consideration* the location of roads and neighboring dwellings, with allowance for views and solar gains." (Emphasis added.) Thus, in contrast, this additional siting provision requires only consideration of these additional factors; they are not mandatory factors that can themselves dictate a site location. The Court reasons that the phrase "with allowance for views" within this sentence "creates an obligation," Opinion, ¶ 24, but incorrectly reads the phrase in isolation, separating it from the other words in the same sentence. The words "should take into consideration" precede the words the Court emphasizes, providing the clear meaning, when read together, that "the location of roads and neighboring dwellings, with allowance for views and solar gains" are things that *should*

22

*be taken into consideration.* They are not mandatory requirements on their own, and thus the District Court correctly reasoned that "the Covenants do not contain a 'bright line' building restriction regarding the viewshed of residences."

¶39 Similarly, Section 2 of the "Architecture" Covenants, titled Building Size and Height requirements, provides that single family dwellings shall have a minimum of 1700 square feet of ground floor area, except for split level (1500 square feet) and two-level (1400 square feet) dwellings may not exceed a height of 35 feet, measured from an average side grade, and provides that any other structure on the lot may not exceed 24 feet in height. These are mandatory, specific requirements governing the building size. Then, in addition to these express requirements, the Architecture Covenants state that "[a]pproval of size and height shall *take into consideration* unusual designs, blocking views, and solar effects of existing dwellings." (Emphasis added.) Thus, again, these contrasting nonspecific architectural provisions require only consideration of these additional factors; they are not mandatory factors that can themselves dictate an architectural design outcome.

¶40 As the Court notes, "should" is commonly regarded as meaning "propriety" of, or "expediency" of, Opinion, ¶ 23, but whatever definition is chosen, "should" should not be merged with "shall," a term that is universally understood and commonly utilized as meaning "mandatory." Further, the phrase "take into consideration" is likewise used to contrast the imposition of a mandate, and is commonly understood to mean "to give careful thought" to, or "a matter weighed or taken into account when formulating an opinion or plan." Merriam Webster's Collegiate Dictionary, 266 (11th ed. 2012). The phrase does not

require that the ultimate outcome of a matter be influenced by the thought given to it, but only that the decision was made after the requisite consideration was given, rather than made upon omission thereof. In *GBSB Holding, LLC v. Flathead Cnty. Bd. of Cnty. Comm'rs*, 2025 MT 22, 420 Mont. 237, 564 P.3d 29, we held, in response to Appellant's argument that a district court had "overlooked" a finding of fact entered in a prior conditional subdivision approval, that the district court "did, in fact, take into consideration" the finding of fact, despite eventually reaching a contrary conclusion, because the record demonstrated the district court had given at least some amount of thought to the finding, as evidenced by it being accurately summarized in the district court's order. *GBSB Holding, LLC*, ¶ 18. While "should" is properly interpreted as used in the Covenants to express the propriety of accounting for neighbors' views in the siting decision, even if it is interpreted as meaning that it created a mandatory obligation to consider viewshed for the siting decision, as the word "shall" obviously did for the architectural design decision, these obligations, in contrast to the express mandates of each provision, did not require more than "tak[ing] into consideration" these factors when rendering a decision.[2]

¶41 The record illustrates, without dispute, the consideration which was given. The Studers submitted the design plan for their home to the DRC in September of 2020, which

---

[2] Indeed, the Covenants further provide that if the DRC fails to act on a building application within 15 days after submission, "approval shall not be required and this article will be deemed to have been fully complied with," *except for* compliance with the express "Minimum Building and Use Restrictions." Article IV, Architectural Control, Section 2. This further illustrates the distinction between the mandatory requirements and the consideration requirements.

24

was initially approved. That approval was rescinded after Mr. Waddell and Ms. Magan took issue with the home's placement in a letter to the SRHOA Board and DRC, dated October 26, 2020, which demanded rescission of the approval and stated clearly their position that any approval of new construction must be made "subject to *consideration* for existing homes." (Emphasis added.) On October 29, 2020, Mr. Waddell and Ms. Magan sent another letter to the SRHOA Board and DRC with the subject line "M.R.Ev. 408 Offer to Compromise," which concluded with Appellants thanking the Board and DRC for its "consideration of this matter." The Studers' attorney responded with a letter to the SRHOA Board on November 12, 2020, stating, in part, that the Studers wished to "respond to the offer of compromise, and act in good faith" by moving the proposed build site "back no more than 20 feet from the current location . . . [if] the HOA [would] reissue its approval of the plans without requiring any further changes" and "cover the $1,000.00 re-staking expense." The letter further explained that the Studers "*have considered* the new concerns raised by the HOA and the neighboring property owners . . . regarding the impact of the placement of their residence on the neighboring property owners' views." (Emphasis added.)

¶42    However, upon a re-review of the Studers' building plans, the plans were approved without requiring a relocation of the proposed structure. The HOA wrote on November 17, 2020, that, "*upon further deliberation*, the Board is withdrawing its request for you to resubmit a construction plan. No further action, in terms of revising the plan is necessary as far as the Board is concerned and your approval to proceed with construction is

reinstated." (Emphasis added.) The undisputed evidence shows that both the Studers and SRHOA indeed considered the effect of the Studers' proposed structure on Mr. Waddell's and Ms. Magan's existing viewshed, including consideration of the Appellants' formal offer of compromise to resolve the viewshed issue. The Studers specifically stated that they had considered Appellants' concerns, and, wanting to do so in good faith, submitted a counteroffer to move their building by up to 20 feet. Thus, beyond mere *consideration*, there was attempted *negotiation* of the issues, including a concrete offer to move the Studers' structure. Despite those efforts of consideration, the Studers' plan was approved. In my view, nothing further was required to satisfy the nonmandatory "consideration" requirements of the Covenants. Appellants do not challenge the existence or authenticity of these back-and-forth communications; they only note that the "20 foot ultimatum" came at a time in which the "Studers and Waddells were in negotiations," referring to their October 29th "Offer to Compromise."[3, 4]

---

[3] While unnecessary to decide the issue here, reliance on communication between the Studers, Mr. Waddell, Ms. Magan, and the SRHOA preserved in the record is not necessarily impermissible. Evidence of an offer to compromise "is not admissible to prove liability for or invalidity of the claim or its amount," but "[t]his rule . . . *does not require exclusion* when the evidence is offered for another purpose." M. R. Evid. 408 (emphasis added). By including and referencing the communications herein, I merely offer these communications to show that all parties involved had notice of the ongoing dispute, time to evaluate it, and actually did "take into consideration" viewshed factors prior to approval of the Studers' building design, as required by the Covenants.

[4] In response to this Concurrence and Dissent, the Court deems the facts referenced here as incomplete and lists additional facts from the record. Opinion, ¶ 28. However, the additional facts are not disputed, nor argued as material disputes by the parties. Rather, they occurred exactly as stated and, despite the Court's own argument about who bears more fault under these facts, they do nothing to justify a trial. "Where the material facts are undisputed, the court must simply identify the applicable law, apply it to the uncontroverted facts, and determine who prevails." *Broadwater Dev., LLC v. Nelson*, 2009 MT 317, ¶ 15, 352 Mont. 401, 219 P.3d 492. Indeed, the only disputed material "fact" the Court identifies is whether there was proper consideration of

¶43 In my view, the Court over-complicates this proceeding by holding that the sufficiency of the consideration required by the Covenants is a factual issue to be determined by a jury. This Court must "simply give effect to the agreement between the parties." *See Newlon v. Teck Am., Inc.*, 2015 MT 317, ¶ 18, 381 Mont. 378, 360 P.3d 1134 (citing *Arrowhead Sch. Dist. No. 75 v. Klyap*, 2003 MT 294, ¶ 20, 318 Mont. 103, 79 P.3d 250). There are no material factual issues remaining, and thus the Court should decide the issue of the consideration required by the Covenants as one of law, either affirming or reversing the District Court on the interpretational issue, and whether the obligation was satisfied based upon the undisputed record. None of the parties argue that judgment was prohibited by existing conflicts in material facts.

¶44 Because I believe the District Court correctly concluded that "[t]he language of the Covenants do[es] not support a determination that the Covenants intended to establish a view shed easement . . . or to establish a duty or obligation on the part of the members seeking to build residences, or the [SRHOA]," I would affirm the entry of summary judgment. Thus, I concur in Issue I and dissent from Issues 2 and 3.

/S/ JIM RICE

Chief Justice Cory J. Swanson joins in the concurring and dissenting Opinion of Justice Jim Rice.

/S/ CORY J. SWANSON

---

Waddells' views, an issue that depends upon what the Covenants require, which is an interpretational issue of law. Opinion, ¶ 28.